The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 14, 2018

## 2018COA84

**No. 15CA0714, People v. Tee — Criminal Procedure — Grand Jury — Indictment; Juries — Predeliberation — Waiver; Crimes — Attempt to Influence a Public Servant**

A division of the court of appeals first rejects defendant's assertion that because the statewide grand jury indictment received by the venue court did not include, for confidentiality reasons, a copy of the foreperson's signature, the venue court lacked jurisdiction. Next, as to defense counsel's waiver of a predeliberation contention, the division distinguishes *People v. Rediger*, 2018 CO 32, relying instead on *Stackhouse v. People*, 2015 CO 48, to find intentional relinquishment of a known right. Finally, the division concludes that the evidence of attempt to influence a public servant was insufficient where defendant only input false data concerning an auto accident on a computer terminal in a

police department, without knowing or having any reason to know that a department technician would screen the information before forwarding the accident report to another database.

COLORADO COURT OF APPEALS      **2018COA84**

Court of Appeals No. 15CA0714
Arapahoe County District Court No. 13CR691
Honorable Marilyn Leonard Antrim, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mike Tee,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
Richman and Fox, JJ., concur

Announced June 14, 2018

Cynthia H. Coffman, Attorney General, Kevin E. McReynolds, Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Dayna Vise, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    After hearing evidence involving identity theft and insurance fraud, a jury convicted Mike Tee of multiple charges, including two counts of attempting to influence a public servant.  Specifically, he contends that

- because the indictment received by the district court did not contain the signature of the grand jury foreperson, it did not confer jurisdiction and all charges must be dismissed;

- because two jurors engaged in predeliberation, he is entitled to a new trial;

- because insufficient evidence supported the two convictions for attempting to influence a public servant, these convictions must be vacated; and

- the mittimus must be corrected to conform to the sentence the trial court announced at the sentencing hearing, despite a lengthier sentence that the court imposed later.

¶ 2    The Attorney General concedes, and we agree, that the mittimus must be corrected.  As to the other three contentions, we conclude that the signature of the foreperson need not be provided to the district court; defense counsel waived any error as to predeliberation; and the evidence was sufficient to support one

1

count of attempting to influence a public servant, but insufficient as to the other count. Therefore, we vacate the judgment as to one count of attempting to influence a public servant (Count 24) and remand to correct the mittimus.

## I. The Grand Jury Indictment Conferred Jurisdiction on the Arapahoe County District Court

¶ 3 Tee first contends "the indictment returned by the grand jury was not signed by the foreman and, therefore, failed to invoke the court's jurisdiction because it did not comply with the substantial requirements of [section] 16-5-201," C.R.S. 2017. That section provides: "Every indictment shall be signed by the foreman of the grand jury returning it and by the prosecuting attorney, his or her assistant, or his or her deputy." Tee also relies on Crim. P. 7(a)(1): "An indictment shall be a written statement presented in open court by a grand jury to the district court which charges the commission of any crime by an alleged offender." He does not challenge the indictment for failure to satisfy any of the requisites set out in Crim. P. 7(a)(2).

¶ 4    Tee correctly points out that the appellate record initially certified included pages one through thirty-five of the indictment, which ended with the following:

> The 2012-2013 Colorado Statewide Grand Jury presents the Indictment contained within and the same is hereby ORDERED FILED this 28 day of March, 2013.
>
> Pursuant to § 13-73-107, C.R.S., the Court designates Arapahoe County, Colorado as the county of venue for the purposes of trial.
>
> Arrest Warrants are Issued for:
>
> Mike Tee . . . .

The signature of the foreperson was not included.

¶ 5    According to the Attorney General, this occurred because the district court for the City and County of Denver, where the grand jury sat, ordered that all information "that might identify Statewide Grand Jurors shall be deemed confidential, not to be released to anyone other than the prosecutors and/or investigators with the Attorney General's Office without written authorization from the Court." *See* § 13-73-103, C.R.S. 2017 ("The court . . . shall enter an order to preserve the confidentiality of all information that might identify state grand jurors when reasonably necessary to protect the state grand jury process or the security of the state grand jurors.").

3

¶ 6    Still, we ordered the Arapahoe County District Court to supplement the record — under seal — with a complete indictment. The court clerk responded with an affidavit attesting that the Denver District Court had sent only these pages.[1]

¶ 7    Tee clarified at oral argument that the problem is not whether the foreperson signed the indictment, but whether the allegedly incomplete copy of the indictment filed in the Arapahoe County District Court gave that court jurisdiction. We discern no jurisdictional defect for two reasons.

---

[1] Upon receipt of this affidavit, we issued a similar order to the Denver District Court, which provided, also under seal, pages showing the signature of the grand jury foreperson for each count. *See, e.g., People v. Bergen*, 883 P.2d 532, 543 (Colo. App. 1994) ("Our review of the sealed grand jury records and the affidavits shows support for the trial court's determination that [the grand jurors rendered a determination as to probable cause based upon the investigation]; therefore, we decline to disturb it on appeal."); *see also People v. Dist. Court*, 199 Colo. 398, 402, 610 P.2d 490, 493 (1980) ("After a careful review of the sealed record containing the transcript of the grand jury colloquy, we have concluded that ordering the disclosure of the colloquy to defense counsel was an abuse of discretion. Although the confidential nature of the colloquy forecloses a detailed explanation, the transcript contains no statements by the district attorney that would constitute potential grounds for establishing the absence of probable cause to indict the defendant because of improper conduct of the district attorney.").

¶ 8     First, "a grand jury indictment constitutes official action accusing an individual of a specific violation of the law, for which the individual may be tried and subsequently convicted." *People v. Thompson,* 181 P.3d 1143, 1148 (Colo. 2008); *see* § 16-1-104(11), C.R.S. 2017 (defining "indictment" as "a written statement, presented by a grand jury to the district court, which charges the commission of a crime by an alleged offender"). And under section 13-73-107(1), C.R.S. 2017, "[a]ny indictment by a state grand jury shall be returned to the chief judge who is supervising the statewide grand jury without any designation of venue." *See* § 13-73-105, C.R.S. 2017 ("Judicial supervision of the state grand jury shall be maintained by the chief judge who issued the order impaneling such grand jury, and all indictments . . . made by such grand jury shall be returned to that judge."). Thus, the requirement in Crim. P. 7(a)(1) that the indictment be "presented in open court by a grand jury *to the district court which charges the commission of any crime*" (emphasis added) applied to the Denver District Court.

¶ 9     Second, Tee cites no authority, nor have we found any, applying the requirements of Crim. P. 7(a)(1) to the district court that is designated "as the county of venue for the purposes of trial"

5

after the statewide grand jury indictment has been returned. And section 13-73-107(1), which provides that after an indictment is returned, "the chief judge shall, by order, designate any county in the state as the county of venue for the purpose of trial," suggests otherwise.

¶ 10    In sum, we conclude that the Arapahoe County District Court had jurisdiction.

### II. Defense Counsel Waived a New Trial Based on Possible Predeliberation by Two Jurors

¶ 11    Tee next contends the trial court "failed to adequately inquire into or address the fact the jurors were predeliberating." He asserts that predeliberation constitutes either structural error or a denial of due process subject to constitutional harmless error review. Under either standard, he continues, all of the convictions must be reversed and the case remanded for a new trial.

¶ 12    The predeliberation concern arose when a victim advocate told the prosecutor, who then informed the trial court, that she had overheard two jurors discussing the case at lunch. The court took testimony from the victim advocate in the presence of the prosecutor and defense counsel. Next, the court questioned these

two jurors separately, also with both counsel present. Then the court read the burden of proof instruction to the entire jury.

¶ 13    According to the Attorney General, we should not review this contention because defense counsel waived it. Tee responds that waiver is inapplicable because "[t]he error was brought to the attention of the court by the prosecution and the trial court had the opportunity to address the issue." But this response deals with preservation, not waiver. *See, e.g., Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) ("[T]o preserve the issue for appeal all that was needed was that the issue be brought to the attention of the trial court and that the court be given an opportunity to rule on it."); *see also People v. Kadell*, 2017 COA 124, ¶ 43 n.1 (J. Jones, J., concurring in part and dissenting in part) ("Simply put, because he didn't draw the court's attention to the issue, it's not preserved."). And the trial court had no reason to declare a mistrial after defense counsel expressly renounced that remedy.

## A.  Law

¶ 14    Three familiar principles guide waiver analysis in criminal cases.

- A "'waived' claim of error presents nothing for an appellate court to review." *People v. Bryant*, 2013 COA 28, ¶ 13 n.2 (quoting *People v. Rodriguez*, 209 P.3d 1151, 1160 (Colo. App. 2008)). In other words, waiver "specifically removes claims from the trial court's consideration." *Id.* (citing *Rodriguez*, 209 P.3d at 1160).

- Still, waiver requires "that the defendant *intentionally* relinquished a *known* right or privilege." *People v. Smith*, 2018 CO 33, ¶ 17; *see People v. Kessler*, 2018 COA 60, ¶ 37 (Because "[d]efense counsel explicitly agreed that the specific evidence at issue was admissible . . . , Kessler, through his counsel, intentionally waived the particular point raised on appeal.").

- And despite this high bar, "even fundamental rights can be waived, regardless of whether the deprivation thereof would otherwise constitute structural error." *Stackhouse v. People*, 2015 CO 48, ¶ 8 (courtroom closure).

¶ 15    The Supreme Court has identified factors limiting waiver. "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are

8

required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *United States v. Olano*, 507 U.S. 725, 733 (1993).

¶ 16 As to these factors, Tee cites no authority, nor are we aware of any in Colorado or from the Supreme Court, holding that juror conduct which could constitute predeliberation is unwaivable; identifying any unique procedure that must be followed to waive predeliberation; or requiring a defendant's informed and voluntary decision to waive predeliberation. Nor does Tee's supplemental brief argue any of these factors.

¶ 17 Absent such authority, *People v. Hambrick*, 947 N.Y.S.2d 139, 141 (N.Y. App. Div. 2012), is informative. There, defense counsel successfully moved for a mistrial because "several members of the jury had impermissibly discussed the specifics of the case and had potentially been biased by the predeliberation discussions." *Id.* On appeal from conviction at retrial, the defendant raised double jeopardy. In holding the claim to be "without merit" because defense counsel had sought the mistrial, the court explained that "the defendant's personal consent to a mistrial was not necessary,

9

and his counsel's decision to move for a mistrial was binding on the defendant." *Id.*[2]

¶ 18    Tee should be equally bound by his counsel's decision not to move for a mistrial. *See People v. Greer*, 197 N.E.2d 22, 24 (Ill. 1964) ("The decision to abandon the motion for a mistrial and go ahead with the trial with the jurors that had already been chosen, with additional jurors to make a full panel, was voluntarily made by the defendant's own attorney. The defendant is not now in a position to allege a failure on the part of the court to declare a mistrial.").

---

[2] The federal circuits have adopted this view. *See, e.g., United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) ("[D]ecisions regarding a mistrial are tactical decisions entrusted to the sound judgment of counsel, not the client."); *United States v. Burke*, 257 F.3d 1321, 1324 (11th Cir. 2001) (The decision not to request a mistrial is a "tactical decision entrusted to defense counsel, binding the defendant even when the defendant expressed a contrary wish to his lawyer."); *United States v. Washington*, 198 F.3d 721, 723-24 (8th Cir. 1999) (requesting a mistrial is a non-fundamental strategic decision); *Watkins v. Kassulke*, 90 F.3d 138, 143 (6th Cir. 1996) (Where "defense counsel consents as a matter of trial strategy to a mistrial, that consent binds the defendant . . . regardless of whether the defendant participates in the decision."); *Galowski v. Murphy*, 891 F.2d 629, 639 (7th Cir. 1989) ("The decision whether to move for a mistrial or instead to proceed to judgment with the expectation that the client will be acquitted is one of trial strategy.").

¶ 19    The Attorney General argues that waiver applies because "[d]efense counsel did more than acquiesce to the trial court's inquiries and resolution of the alleged predeliberation issue, he affirmatively approved the trial court's line of questioning and actively participated in further instructing the jury to address his concerns." According to the Attorney General, two lines of Colorado authority support this conclusion.

¶ 20    First, the Attorney General asserts that when defense counsel is an "active participant" with the trial court in matters involving the jury, such action "amounts to a waiver." *Valley v. People*, 165 Colo. 555, 561, 441 P.2d 14, 16 (1968); *see also People v. Tillery*, 231 P.3d 36, 44 (Colo. App. 2009) (holding that Tillery's argument that the instruction was prejudicial because it referred to "the incident" was waived by his active participation in its wording), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo. 2011).[3]

---

[3] Similar language has been employed when finding waiver in other contexts. *See, e.g., People v. Mascarenas*, 666 P.2d 101, 106 (Colo. 1983) ("[T]he defendant effectively waived his rights to final disposition within the ninety-day statutory limitation period [under the Uniform Mandatory Disposition of Detainers Act] by his active participation in the trial setting delays and in his agreement to the

¶ 21     Second, the Attorney General relies on *People v. Rediger*, 2015 COA 26, ¶ 59 (*Rediger I*), *aff'd in part and rev'd in part*, 2018 CO 32 (*Rediger II*).  There, defense counsel told the trial court that he had read the instructions and was "satisfied."  *Rediger I*, ¶ 47.  On this basis, the division concluded that instructional error had been waived.

¶ 22     But the supreme court reversed in part, holding that counsel's colloquy with the court did not show either actual knowledge or intentional relinquishment of the defendant's right to have the jury correctly instructed on the elements of the offense in the indictment.  *Rediger II*, ¶ 45.  Because the supreme court's decision was announced after briefing had closed in this case, we requested supplemental briefs on waiver.  Having reviewed that briefing, we draw two conclusions.  First, *Rediger II* does not categorically preclude finding a waiver based on defense counsel's active participation in trial court action that appellate counsel challenges on appeal, although it may sometimes require a closer look at

---

appropriate dates."); *see also People v. Arledge*, 938 P.2d 160, 166 (Colo. 1997) ("[A]ctive participation by the defendant in such delay constitutes waiver" of the right to speedy trial.).

12

exactly what counsel did. Second, on the facts presented, *Stackhouse* is more illuminating than is *Rediger II*.

¶ 23 Beginning with active participation, in *Rediger II* the trial court asked defense counsel a single question; counsel answered with a single sentence. By contrast, the record before us shows that the trial court and defense counsel were involved in an ongoing, interactive exchange. Thus, the record supports applying cases such as *Valley*, as the Attorney General asserts.

¶ 24 Even so, after *Rediger II*, is the waiver analysis now more complex? True, the supreme court said nothing about this line of authority, probably because the record did not show active participation by defense counsel in the flawed jury instruction, which appeared to have been prepared by the prosecution. *Rediger II*, ¶ 8. Still, the *Rediger II* court's emphasis on *intentional* relinquishment of a *known* right requires further scrutiny. In other words, after *Rediger II*, would trial counsel's active participation always prevent appellate counsel from identifying an error and arguing that it had somehow escaped trial counsel's attention?

¶ 25 Start with a known right. After all, only a right that is known could be intentionally relinquished.

¶ 26    The *Rediger II* court did not define "known."  Defense counsel acknowledged having read the instructions.  So, what more than knowledge presumed from the circumstances must be present before a right is known?  Comparing waiver to invited error suggests one answer.

¶ 27    Like waiver, invited error bars relief on direct appeal.  *See People v. Novotny*, 2014 CO 18, ¶ 47 (noting "the specter of invited error, which precludes appellate review").  However, "although invited error in most cases will result from defense counsel's inadvertence or negligence, it is the defendant who must bear the stigma of a conviction and the burden of prison time; accordingly, application of the plain error doctrine, rather than the invited error doctrine," is appropriate.  *People v. Stewart*, 55 P.3d 107, 119 (Colo. 2002).  *See also People v. Gross*, 2012 CO 60M, ¶ 2 ("The attorney incompetence exception does not apply to deliberate, strategic acts of defense counsel but rather to inadvertent errors or oversights.").  As the division explained in *People v. Perez-Rodriguez*, 2017 COA 77, ¶ 27, "[t]o determine whether the statement 'no objection' or even silence should be characterized as either deliberate or

inadvertent, it is necessary to consider the objection or silence in the context of its circumstances."

¶ 28    Although *Rediger II* did not cite *Stackhouse*, looking at *Stackhouse* through the prism of inadvertence offers a path forward. There, the trial court closed the courtroom during a portion of voir dire. Of course, defense counsel was present. Counsel failed to object and voir dire continued. Still, the court found a waiver. *Stackhouse*, ¶ 17.

¶ 29    A principled line between these cases would be that in *Rediger II*, merely reading the instructions does not compel the conclusion that counsel recognized prejudice to the defendant's right to be tried on the statutory elements under which he had been charged because the elements on the instructions and those on the information came from different subsections of the same statute. The explanation could have been inadvertence, as the difference in elements was not striking. Contrasting *Stackhouse*, counsel's mere presence when the trial court directed that the courtroom be closed permits no reasoned doubt that counsel recognized the defendant's public trial right was being impaired. *See Webster's Third New*

*International Dictionary* 1252 (2002) (defining "know" as "to recognize the quality of: see clearly the character of").

¶ 30 After drawing this line here, the record compels the conclusion that because defense counsel recognized the predeliberation concern, this case falls on the *Stackhouse* side of that line. The trial court asked the victim advocate, "Do you think [the two jurors] were discussing the ultimate outcome of the case?" After the advocate answered, defense counsel asked her, "[O]ne thing that I would be concerned about . . . is, did you think from what you heard from the jurors that there was a decision on their part that they had heard enough?" The advocate answered, "I really don't. I honestly and truly don't." Then defense counsel said, "Nothing else."

¶ 31 In *Stackhouse*, ¶ 5, our supreme court affirmed "the court of appeals' holding that Stackhouse waived his right to public trial during voir dire by not objecting to the trial court's *known* closure." (Emphasis added.) Likewise in this case, everyone involved recognized the specter of predeliberation. And just as *Stackhouse*, *id.* at ¶ 16, presumed counsel's knowledge of the proper procedure to address a courtroom closure, we presume counsel's awareness

16

that juror predeliberation would raise a constitutional concern. *People v. Flockhart,* 2013 CO 42, ¶ 19 (An "erroneous pre-deliberation instruction may prejudice a defendant's constitutional right to a fair trial.").

¶ 32    Then consider intentional relinquishment.

¶ 33    After the trial court had questioned the first of the two jurors, defense counsel told the court: "I didn't hear anything at this point that would make me want to move for a mistrial based on the fact that the jurors looked engaged in a deliberate guilt or not guilt process to me." Thus, counsel also recognized the nexus between the disease — "[pre]deliberate guilt or not guilt" — and the possible cure — "a mistrial."

¶ 34    For the second juror, defense counsel asked the court "if we have questions of this juror, can we approach and tell you that?" The court said yes. And after the court questioned the second juror, counsel told the court "for the record . . . I would have said or asked questions very much along the same lines . . . ." Tee does not assert, nor does our review of the record disclose, anything in the second juror's answers that should have changed counsel's earlier mistrial calculus. To the contrary, the second juror assured the

17

trial court that she had not discussed Tee's guilt, that she understood the relative burdens for the prosecution and the defense, and that she had not reached "a final conclusion in this matter." Thus, even more so than in *Stackhouse*, ¶ 16, allowing Tee to "seek invalidation of an adverse verdict" on which these two jurors deliberated "would encourage gamesmanship."

¶ 35    Finally, counsel asked the court to read the jury instruction on burden of proof. The court responded that it "would rather read it to the whole jury." Counsel clarified "[t]hat's what I meant." After the jury had been reconvened, the court did so. Counsel sought no further relief.

¶ 36    The totality of defense counsel's statements stand in marked contrast to our supreme court's observation in *Rediger II*, ¶ 42, that "[t]he record before us reveals no evidence, either express or implied, that Rediger['s counsel] intended to relinquish his right to be tried in conformity with the charges set forth in his charging document when he generally acquiesced to the jury instructions," nor that "Rediger knew of the discrepancy between the People's tendered jury instructions and the charging document," *id.* at ¶ 43.

18

¶ 37    Opposite to what occurred in *Rediger II*, here the dialogue between defense counsel and the trial court over this issue went far beyond a "rote statement that [counsel] is not objecting . . . ." *United States v. Zubia-Torres,* 550 F.3d 1202, 1207 (10th Cir. 2008) ("The record is simply devoid of any evidence that defense counsel knew of the argument or considered making it."), *cited with approval in Rediger II,* ¶ 45; *see also United States v. Perez,* 116 F.3d 840, 845-46 (9th Cir. 1997) (perceiving no waiver when the record revealed "that neither defendants, the government, nor the court was aware" of the issue raised on appeal), *cited with approval in Rediger II,* ¶ 42.

¶ 38    Despite all this, Tee's supplemental brief asserts that "[t]here would be no reason, had counsel been aware of the error, not to ask for a mistrial or to ask the court to address the fact the jurors were predeliberating." This assertion misses the mark in two ways.

¶ 39    First, it assumes that inquiry into counsel's strategic purpose plays any role in evaluating an affirmative waiver. But Tee cites no authority, nor are we aware of any in Colorado, tempering the effect of a specific, affirmative waiver based on possible lack of a strategic purpose. As the division explained in *Perez-Rodriguez,* ¶ 25,

"[i]nvited error is sometimes referred to as a strategic error. But this does not mean that the 'strategy' must be competent or well planned. It simply means that the action that results in invited error must be deliberate rather than inadvertent."

¶ 40    True, in *Stackhouse*, ¶ 15, our supreme court observed, "there are sound strategic reasons to waive the right to a public trial, as is particularly apparent in the context of Stackhouse's jury selection for his trial on charges of sexual assault on a minor." But *Stackhouse* involved an implied waiver based on counsel's silence; Tee's counsel expressly renounced a mistrial.

¶ 41    Second and more importantly, this assertion ignores the possibility that counsel's strategic purpose was to preserve his credibility by choosing to disclaim an issue that was a sure loser. *See People v. McCoy*, 2015 COA 76M, ¶ 99 (Webb, J., specially concurring) ("[C]ounsel may have decided that an unsupported statutory sufficiency argument would probably be unsuccessful and raising it would undercut counsel's credibility.") (*cert. granted in part* Oct. 3, 2016). Because the trial court developed the issue, the

court would have been entitled to expect a candid response.[4] "Forfeiture takes place when counsel or a defendant negligently bypasses a *valid* argument." *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010) (emphasis added) (cited with approval in *Perez-Rodriguez*, ¶ 27).

¶ 42     In sum, and notwithstanding the "presumption *against* waiver*," *Rediger II*, ¶ 46 (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)), defense counsel's affirmative statements constitute a waiver. So, as to Tee's contention that predeliberation constituted structural error or a due process violation entitling him to a new trial, we have nothing to review. *See United States v. Montoya*, 782 F.2d 1554, 1556 (11th Cir. 1986) (stating that, absent exceptional circumstances, defendant's withdrawal of motion for mistrial left "nothing for this court to review").

### III.  The Evidence Was Insufficient as to One Count of Attempting to Influence a Public Servant

¶ 43     Tee was convicted of two counts of attempting to influence a public servant based on evidence that he made allegedly false reports of car accidents. As to the first report, he provided

---

[4] Of course, whether counsel had such a purpose could be explored under Crim. P. 35(c) as an indication of ineffectiveness.

information in person to a police officer who created a report based on what Tee had told him; for the other report, he filled in an accident report form on a computer terminal at a kiosk in the police department.  We conclude that the evidence was sufficient to support the conviction for attempting to influence a public servant as to the police officer, but not the conviction based on the form filled in at the kiosk.

## A.  Standard of Review and Law

¶ 44    A challenge to the sufficiency of the evidence requires an appellate court "to determine whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime charged beyond a reasonable doubt."  *People v. Moore*, 226 P.3d 1076, 1088 (Colo. App. 2009).  The prosecution must be given the benefit of every reasonable inference that might fairly be drawn from the evidence.  *People v. Carrasco*, 85 P.3d 580, 582-83 (Colo. App. 2003).  A conviction will not be set aside merely because the jury could have reached a different conclusion based on the evidence.  *People v. Fuller*, 791 P.2d 702, 706 (Colo. 1990).

However, if the appellate court concludes that evidence was insufficient as to a count, then the judgment of conviction must be reversed and that count cannot be retried. *See People v. Lybarger*, 700 P.2d 910, 916 (Colo. 1985) ("[I]f the evidence is insufficient to support the conviction, the retrial of the defendant on the same charge would constitute a violation of the constitutional guarantee against double jeopardy.").

¶ 45 Under section 18-8-306, C.R.S. 2017,

> [a]ny person who attempts to influence any public servant by means of deceit or by threat of violence or economic reprisal against any person or property, *with the intent thereby to alter or affect the public servant's decision, vote, opinion, or action concerning any matter which is to be considered or performed by him* or the agency or body of which he is a member, commits a class 4 felony.

(Emphasis added.) In supplemental briefs on this statute, the parties agreed that it is a specific intent crime. So do we.

¶ 46 Section 18-8-306 is "aimed at attempts to influence public servants in their official capacities to improperly alter or affect the performance of their official duties." *People v. Beck*, 187 P.3d 1125, 1128 (Colo. App. 2008), *overruled on other grounds by People v. Molina*, 2017 CO 7. It "encompasses any employee of the

government and even includes non-employees performing government functions." *People v. Sena,* 2016 COA 161, ¶ 12. Section 18-8-306 "requires the prosecution to prove that the defendant acted with the specific intent to influence a public servant[]." *People v. Janousek,* 871 P.2d 1189, 1196 (Colo. 1994). But "whether the public servant was actually influenced by the defendant's attempts is not an element of the crime." *Sena,* ¶ 16.

## B. Analysis

### 1. Police Officer

¶ 47 Tee contacted the Aurora Police Department, claiming that his car had been struck in a hit-and-run accident. The responding officer testified that he met with Tee. Then, based on the information Tee had provided, the officer prepared and filed an accident report. That report was later offered into evidence as part of Farmers Insurance Company's file on Tee's insurance claim.

¶ 48 Tee argues that the evidence was insufficient to show he attempted to influence the police officer because "[t]he officer testified he does not do anything or make any decisions." But the record shows that Tee intended "to alter or affect the public servant's . . . action concerning any matter which is to be

24

considered or performed by him." § 18-8-306. Specifically, the responding officer testified that writing police reports is an official function that he performs. Then he described his actions based on Tee having reported the accident to him:

> Q: So based on what he told you, you prepared your report?
>
> A: I did.
>
> Q: Did you file this report?
>
> A: I did.

*See, e.g.*, *People v. Van De Weghe*, 2012 COA 204 (holding that the defendant attempted to influence a public servant when he provided false information to a police officer during a traffic stop); *see also Sena*, ¶ 16 ("For the People to prove that defendant intended to alter [the officer's] actions, the prosecution must only provide sufficient evidence for a rational trier of fact to conclude that defendant anticipated a different result if he had given" true information.).

¶ 49   Viewing this evidence in a light favorable to the prosecution, as we must, it supports the conviction for attempting to influence a public servant beyond a reasonable doubt.

## 2. Kiosk Report

¶ 50    Tee argues that the evidence does not show his act "of filing an online accident report at . . . [the] kiosk was done with the specific intent to alter or affect a public servant's decision," as required by section 18-8-306.  We agree.

¶ 51    The prosecution called a front desk technician at the police department to testify about the accident report that Tee had filled in.  She explained that for such an online accident report, which includes both forms filled in on a home computer and those completed on a terminal at a kiosk:

- "The citizen would come in, we would direct them to the kiosk that we have in the lobby to fill out an accident report.  And if they had any questions, then we would go out and assist them in filling out the report."

- When the citizen was done filling out the report, he or she "would come back up to the front desk and they would get their case number, and then that would be all that they needed to do."

She also testified about performing her duties:

- "Once the citizen enters the report, we as lead technicians later — we go in and review the report to make sure that the location is in the city ordinance . . . and that some of the information is filled out."

- Citizens "can come up to the front desk window if they have some kind of difficulty working on the computer."

- "Usually we'll go into the system if [the citizen] ask[s] for [the report] for their insurance. We'll print it out for them."

She explained that when using this process,

> [m]ost people think that when they come in to do an accident report they're going to talk to me to do the accident report, not to be referred to a kiosk. So that's — we give people the option. They can do either or. Or they can go home and they can do it on their own computer if they're more comfortable with that.

Finally, she added that after the report is entered, "[t]he information gets forwarded to another computer system. So it's kind of like the online reporting system is its own program itself. And once it's reviewed, then there's a bridge that goes to another system."

¶ 52 But she did not recall anything about Tee — such as whether he "attempted to talk" to her or gave her "information about . . . the alleged accident." Nor did she testify that he had caused the

27

system to print out a report. In anticipation of testifying, she had printed out the accident report that the prosecution introduced into evidence from the police department's online reporting system.

¶ 53    According to the Attorney General, this testimony sufficed to prove that Tee "intended his representations about a supposed accident at the . . . city kiosk to influence the public servant on site . . . to provide him with an official accident report." True, the technician testified that she would have "done something different if [she] knew the person wasn't giving accurate information in that report." But this testimony fails to show that Tee had any interaction with the technician, much less that he knew the technician needed to approve the report, after he filled in the form using the terminal at the kiosk. Simply put, unless he knew of the technician's involvement, he could not have intended to influence her actions. *See People v. Prante*, 177 Colo. 243, 247, 493 P.2d 1083, 1084 (1972) (stating that assault on a police officer requires proof of intent to cause bodily injury and knowledge that the victim is an officer).

¶ 54    Colorado cases addressing sufficiency of the evidence under section 18-8-306 generally show a link between the defendants and

the public servants whom they intended to influence. *See, e.g.,*
*Beck*, 187 P.3d at 1127 (the defendant provided false identifying
information to a police officer); *see also People v. Taylor*, 159 P.3d
730, 734 (Colo. App. 2006) ("[The] defendant caused a false written
instrument to be delivered to a public servant with the intent of
altering the public servant's decision relating to the termination of
defendant's liberty interest."), *abrogated on other grounds by People
v. Fortson*, 2018 COA 46; *People v. Schupper*, 140 P.3d 293, 298-99
(Colo. App. 2006) (The defendant "used 'deceit' in the form of false
representations on his application in order to influence a public
servant with the intent to alter or affect his or her decision to
appoint counsel.").

¶ 55     Still, in *People v. Montante*, 2015 COA 40, ¶ 2, on which the
Attorney General primarily relies, that link was less clear. There,
the defendant, a physician, was convicted of attempting to influence
a public servant. The evidence showed that he had written false
information on a physician certification form, which he then gave to
an undercover officer masquerading as a patient who supposedly
needed the certification to obtain a medical marijuana identification

card from the Colorado Department of Public Health and Environment.

¶ 56    The division explained that the physician certification "is part of the application that an applicant must submit to the Colorado Department of Public Health and Environment." *Id.* And these alleged false statements "constituted an attempt to influence, by means of deceit, a public official at the Department, with the intent thereby to affect the decision to issue [the patient] a medical marijuana identification card." *Id.* at ¶ 5.

¶ 57    Although the division did not address sufficiency, it analyzed whether section 18-8-306 provided sufficient notice to the physician. It concluded that the defendant "was on fair notice that the making of false representations with the expectation that the Physician Certification would be submitted to the Department would constitute the offense of attempt to influence a public servant." *Id.* at ¶ 46.

¶ 58    This conclusion survives scrutiny because article XVIII, section 14(3)(c) of the Colorado Constitution, provides:

> Within thirty days of receiving the information referred to in subparagraphs (3)(b)(I)-(IV), the state health agency *shall verify medical*

*information contained in the patient's written documentation.* The agency shall notify the applicant that his or her application for a registry identification card has been denied if the agency's review of such documentation discloses that: the information required pursuant to paragraph (3)(b) of this section has not been provided or has been falsified; the documentation fails to state that the patient has a debilitating medical condition specified in this section or by state health agency rule; or the physician does not have a license to practice medicine issued by the state of Colorado. Otherwise, not more than five days after verifying such information, the state health agency shall issue one serially numbered registry identification card to the patient . . . .

(Emphasis added.) Thus, a fair inference could be made that the physician knew his false statements written on the certification would influence a public servant's decision to issue a medical marijuana identification card. *See Sena*, ¶ 16 ("Intent can rarely be proven other than through circumstantial or indirect evidence."); *People v. Hayward*, 55 P.3d 803, 806 (Colo. App. 2002) ("[E]very person is generally presumed to know the law . . . .").

¶ 59    By contrast, in the case before us, the prosecution did not present any evidence showing that Tee knew the technician — or anyone else, for that matter — would screen the information that he

31

input at the kiosk and then approve the report. Nor does the Attorney General direct us to any statute describing human involvement in this process. And unlike the hard copy physician certification and registry card at issue in *Montante*, filling in a form on a computer terminal suggests an entirely automated process. *Cf. People v. Rice*, 198 P.3d 1241, 1244 (Colo. App. 2008) ("When the computer system determines a claimant is eligible for unemployment benefits, a computer prints a check that is automatically sent to the claimant. Typically, an eligible claimant completes a claim and receives a check without interacting with a person.").

¶ 60 At most, the record shows that Tee filled in false information on a report form using the terminal at the police department kiosk. Mere false reporting, however, while prohibited by section 18-8-111(1)(d), C.R.S. 2017, "is not a specific instance of attempt to influence a public servant." *People v. Blue*, 253 P.3d 1273, 1278 (Colo. App. 2011). Indeed, "[t]he attempted influence offense can occur without any false reporting at all." *Id.*

¶ 61 In the end — even given the high standard for sufficiency of the evidence claims — we cannot say that the evidence was

32

sufficient to prove beyond a reasonable doubt Tee's second conviction for attempt to influence a public servant.

### IV. The Mittimus Must Be Corrected

¶ 62    The Attorney General concedes, and we agree, that the trial court violated Tee's double jeopardy rights when it orally announced sentences totaling twelve years, but then the mittimus showed a total sentence of eighteen years. As Tee correctly points out, some of his concurrent sentences were improperly changed to consecutive sentences; and the mittimus listed the first sentence as four years, rather than the three-year term announced by the trial court. *See People v. Sandoval*, 974 P.2d 1012, 1015 (Colo. App. 1998) ("Although a court may correct an illegal sentence without implicating double jeopardy concerns, it may not increase a lawful sentence after the defendant has begun serving it.") (citation omitted).

¶ 63    Everyone also agrees that the mittimus incorrectly shows a conviction on Count 5, which the trial court dismissed on Tee's motion for judgment of acquittal.

¶ 64    Thus, we remand for the trial court to correct the mittimus to reflect the sentence announced, to remove the reference to

33

conviction on Count 5, and to vacate the sentence imposed on Count 24.

## V. Conclusion

¶ 65    The judgment is vacated as to Count 24 and otherwise affirmed.  The case is remanded with directions to correct the mittimus.

JUDGE RICHMAN and JUDGE FOX concur.