The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 29, 2021

**2021COA102**

**No. 18CA1212, *People v. Johnson* — Crimes — Unlawful
Purchase of Firearms**

As a matter of first impression, a division of the court of
appeals interprets the meaning of "transfer" in section
18-12-111(1), C.R.S. 2020 — the "straw purchaser" statute. The
division concludes that a "transfer" for purposes of section
18-12-111(1) occurs when a person knowingly purchases a firearm
for the purpose of sharing it with an ineligible person. Accordingly,
the division affirms the defendant's judgment of conviction.

Court of Appeals No. 18CA1212
Adams County District Court No. 17CR2274
Honorable Donald S. Quick, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sylvia Johnson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE LIPINSKY
Román and Harris, JJ., concur

Announced July 29, 2021

Philip J. Weiser, Attorney General, Joseph G. Michaels, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

¶ 1     The General Assembly enacted Colorado's "straw purchaser" statute following the revelation that adults had sold guns to the teenagers who opened fire on fellow students and teachers at Columbine High School.  After Columbine, the legislature enacted section 18-12-111(1), C.R.S. 2020, to prevent "straw purchasers" from obtaining firearms for persons who could not legally possess them.  The statute imposes criminal liability for knowingly "purchas[ing] or otherwise obtain[ing] a firearm on behalf of or for transfer to a person who the transferor knows or reasonably should know is ineligible to possess a firearm . . . ."  *Id.*  Section 18-12-111(1) does not include a definition of "transfer."

¶ 2     In this case, we consider whether a "transfer" under section 18-12-111(1) occurs when a person knowingly purchases a firearm for the purpose of sharing it with an ineligible person.

## I.     Introduction

¶ 3     Sylvia Johnson appeals from a judgment of conviction entered on a jury verdict finding her guilty of unlawful purchase of a firearm pursuant to section 18-12-111(1).

¶ 4     The prosecution argued at trial that Johnson violated the statute by purchasing a firearm with Jaron Trujillo, whom she

described as her common law husband and who was ineligible to possess the firearm, and then storing it in a closet where Trujillo could access it. Johnson contends that the statute does not apply to her because she did not buy a firearm on someone else's behalf while falsely claiming it was for herself, or that she "intentionally fronted for another" and thereby played a "conscious, willing role of the middleman." She asserts that, under her interpretation of section 18-12-111(1), there was insufficient evidence to support her conviction.

¶ 5     Because we disagree with Johnson's reading of section 18-12-111(1), we hold there was sufficient evidence to support Johnson's conviction. We also disagree with Johnson's other contentions of error. For these reasons, we affirm the judgment of conviction.

## II.     Background

¶ 6     Johnson knew that Trujillo could not legally possess a firearm under the terms of a protection order entered against him and because he was a convicted felon. With this knowledge, Johnson visited a pawnshop with Trujillo. At the pawnshop, Trujillo

examined firearms available for sale and Johnson purchased a firearm.

¶ 7    Sixteen days after Johnson purchased the firearm, a police officer responded to a call from the management of Johnson's apartment complex reporting that Trujillo was staying at Johnson's apartment in violation of the protection order. The protection order barred Trujillo from entering the apartment complex, as well as from "possess[ing], purchas[ing], or control[ling]" a firearm.

¶ 8    After observing Trujillo leave Johnson's apartment to smoke a cigarette, the officer arrested him for violating the protection order. The officer asked Trujillo whether he had any weapons. Trujillo acknowledged he had a gun in his pocket and said that it belonged to Johnson.

¶ 9    Johnson was charged with violating section 18-12-111(1). At her trial, the prosecution called Trujillo as a witness and asked him whether he and Johnson had intended to purchase a firearm at the pawnshop. Trujillo responded that he and Johnson went to the pawnshop to buy jewelry. But on cross-examination, Trujillo responded affirmatively to defense counsel's question, "[D]id you go to the pawnshop because Ms. Johnson wanted to purchase a gun?"

On redirect examination, the prosecutor asked Trujillo to reconcile these conflicting statements:

> Q.  So I will ask you, sir, why did you go to the pawn shop?
>
> A.  Could be because she wanted a gun and also jewelry.  I don't remember that day.  I honestly don't remember.

¶ 10     When the questioning turned to how Trujillo had obtained the firearm, he testified that he knew Johnson kept it in her closet. Although Trujillo asserted that he did not remember whether Johnson told him where she stored the firearm, he said he knew Johnson kept it in the closet so it would not "be in reach" of their children.  Trujillo explained that he and Johnson had previously stored other guns at that location.  Neither Trujillo nor Johnson testified that Johnson warned Trujillo not to take the firearm. Trujillo said he took the firearm while Johnson was away from the apartment.

¶ 11     Johnson testified that she purchased the firearm for herself and never gave it to Trujillo.  But she also said she told Trujillo where she stored the firearm.  She admitted that Trujillo lived with her and the children in the apartment, even though he was not

allowed to enter the apartment under the terms of the protection order.

¶ 12     In addition, Johnson conceded that she was aware the protection order barred Trujillo from "possess[ing], purchas[ing], or control[ling] a firearm or other weapons" and that, as a convicted felon, Trujillo "was not allowed to possess a firearm." The jurors also heard a recording of a phone call that Trujillo made to Johnson from jail about seven months before Johnson and Trujillo visited the pawnshop. During that call, Trujillo told Johnson he had been convicted of a felony.

¶ 13     During cross-examination, the prosecutor pressed Johnson on her reasons for purchasing the firearm:

> Q. So you were concerned about Mr. Trujillo's safety and especially when he would smoke cigarettes on this balcony; is that correct?
>
> A. In all reality, sir, I was concerned about my whole family's safety.
>
> Q. And that's not what I'm asking you, Ms. Johnson. . . . Yes or no, you were concerned about Mr. Trujillo's safety when –
>
> A. Yes, I was.
>
> Q. – he was outside smoking?
>
> A. Yes, I was.

5

¶ 14    Johnson raises three arguments on appeal.  First, she asserts there was insufficient evidence to support her conviction because a "transfer" for purposes of section 18-12-111(1) requires more than merely providing the ineligible person with access to the firearm. Second, she contends that the trial court reversibly erred by allowing the prosecutor to ask Trujillo whether defense counsel had previously represented him.  Third, Johnson argues that section 18-12-111(1) is unconstitutionally vague on its face and as applied.

### III.    The Record Contains Sufficient Evidence to Support Johnson's Conviction for Violating Section 18-12-111(1)

#### A.    The Plain Meaning of Section 18-12-111(1)

¶ 15    We review issues of statutory interpretation de novo.  *People v. Subjack*, 2021 CO 10, ¶ 14, 480 P.3d 114, 117.  In construing the meaning of a statute, we must interpret its plain language to ascertain and give effect to the General Assembly's intent.  *Id.* When the words and phrases of a statute are clear, we read them in context, construe the language according to its common usage, and apply the statute as written.  *Manjarrez v. People*, 2020 CO 53, ¶ 19, 465 P.3d 547, 550-51.

6

¶ 16    We focus our analysis of section 18-12-111(1) on the meaning of "transfer" because, for reasons unrelated to the issues raised on appeal, Johnson, the prosecutor, and the trial court agreed to provide the jury with an instruction that referred to "for transfer to" in place of the more expansive "on behalf of or for transfer to" statutory language. While we acknowledge that "[s]ufficiency of evidence is measured 'against the elements of the offense, not against the jury instructions,'" *People v. Helms*, 2016 COA 90, ¶ 52, 396 P.3d 1133, 1146 (quoting *People v. Vigil*, 251 P.3d 442, 447 (Colo. App. 2010)), we cannot decide a factual issue not presented to the jury — here, whether Johnson purchased the firearm "on behalf of" Trujillo.

¶ 17    Johnson's contention that section 18-12-111(1) does not apply to her because she did not (1) act as a "straw purchaser" by buying a gun on someone else's behalf while falsely claiming it was for herself and (2) play a "conscious, willing role of the middleman" is inconsistent with the language of the statute for two reasons. First, nothing in section 18-12-111(1) requires that the defendant falsely claim the firearm was for himself or herself. Second, Johnson relies on legislative history referring to the "role of the middleman" to

narrow the statute's scope.  As explained below, however, we need not rely on legislative history to interpret the statute because its language is unambiguous.  Further, a court may not vary the language of a statute by referring to legislative history.  *See Mitchell v. Chengbo Xu*, 2021 COA 39, ¶ 37, ___ P.3d ___, ___ (Lipinsky, J., specially concurring) (noting that, where statutory language is plain and concise and the meaning is clear, a court should not vary that meaning by resort to legislative history).

¶ 18     In addition, Johnson supports her argument by pointing to definitions of "transfer" that she contends do not encompass the act of merely providing access to the subject item.  For example, she cites to *Chow v. State*, 903 A.2d 388 (Md. 2006), which addressed the meaning of "transfer" in the 2002 version of the Maryland firearm application statute.  The Maryland statute stated, in relevant part, that "[a] person who is not a regulated firearms dealer may not sell, rent, *transfer*, or purchase any regulated firearm until after 7 days shall have elapsed from the time an application to purchase or transfer shall have been executed . . . ."  *See Chow*, 903 A.2d at 394 (quoting Md. Code (1957, 1996 Repl. Vol., 2002 Supp.), Art. 27, § 442(d)(1)).  Based on its review of the language of

8

other Maryland firearms statutes, the *Chow* court concluded that "transfer" in the Maryland firearm application statute meant a permanent conveyance. *Id.* at 402.

¶ 19    But the court's reasoning in *Chow* does not apply to our interpretation of section 18-12-111(1). The statutory scheme in which section 18-12-111(1) appears compels a broader reading of "transfer" in that statute than the meaning of the word in the Maryland statute.

¶ 20    The Colorado analogues to the Maryland firearm statutes are found in article 12 of title 18 of the Colorado Revised Statutes, which addresses "Offenses Relating to Firearms and Weapons." We look to the other statutes within article 12 to inform our analysis of the meaning of "transfer" in section 18-12-111(1). *See People v. Roletto,* 2015 COA 41, ¶ 18, 370 P.3d 190, 194 ("When we interpret related statutes, it is important that we harmonize their meanings and interpret their words consistently." (quoting *Gen. Elec. Co. v. Niemet,* 866 P.2d 1361, 1366 (Colo. 1994))).

¶ 21    Section 18-12-112, C.R.S. 2020, establishes that the General Assembly gave "transfer" a broad definition for purposes of the prohibition against the "transfer" of firearms by "straw purchasers."

9

Section 18-12-112, which addresses private firearm transfers, includes a background check requirement for transfers or attempts to transfer firearms by persons who are not licensed gun dealers. Section 18-12-112(6) specifies that this background check requirement does not apply to temporary transfers of firearms, including "*[a] transfer that is a bona fide gift or loan between immediate family members . . . .*" § 18-12-112(6)(b) (emphasis added). In addition, section 18-12-112(6)(d) confirms that, subject to conditions not applicable here, a "transfer" of a firearm can be "temporary" and can "occur . . . in the home of [an] unlicensed transferee." *See also* § 18-12-112(6)(e) (referring to "*[a] temporary transfer of possession* without transfer of ownership or a title to ownership") (emphasis added); § 18-12-112(6)(g) (referring to "*[a]ny temporary transfer* that occurs while in the continuous presence of the owner of the firearm") (emphasis added); § 18-12-112(6)(h) ("*[a] temporary transfer* for not more than seventy-two hours") (emphasis added). The language of these statutes indicates that the General Assembly did not carve out from the scope of section 18-12-111(1) temporary transfers of a firearm in the form of shared use.

10

¶ 22    Johnson next turns to the Merriam-Webster dictionary definition of "transfer" to support her reading of section 18-12-111(1).  As she acknowledges, that dictionary's definition of the verb "transfer" includes

> 1. a: to convey from one person, place, or situation to another: MOVE, SHIFT
>
>    b: to cause to pass from one to another: TRANSMIT
>
>    . . .
>
> 2. : to make over the possession or control of: CONVEY

Merriam-Webster Dictionary, https://perma.cc/FHA7-MJAC.  The definition of the noun "transfer" in the dictionary includes "an act, process, or instance of transferring."  *Id.*  Thus, the dictionary definition of "transfer" on which Johnson relies, like the use of "transfer" in the subsections of section 18-12-112, includes the temporary transfers that occur when a shared item is conveyed, moved, or shifted between the users.

## B.    Analysis

¶ 23    We next consider whether, based on this interpretation of "transfer," there was sufficient evidence to support Johnson's conviction under section 18-12-111(1).  The de novo standard of

11

review applies to determinations of the sufficiency of the evidence. *People v. Hines*, 2021 COA 45, ¶ 31, ___ P.3d ___, ___. We conclude there was sufficient evidence to support Johnson's conviction.

¶ 24    In reviewing the sufficiency of the evidence, we evaluate "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty . . . beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (citation omitted). We afford the prosecution the benefit of every reasonable inference that may fairly be drawn from the evidence. *Id.* at 1292.

> It is the fact finder's role to weigh the credibility of witnesses, to determine the weight to give all parts of the evidence, and to resolve conflicts, inconsistencies, and disputes in the evidence. We may not "substitute [our] judgment for that of the jury and reweigh the evidence or the credibility of witnesses."

*People v. Poe*, 2012 COA 166, ¶ 14, 316 P.3d 13, 16 (citations omitted) (quoting *People v. Sharp*, 104 P.3d 252, 256 (Colo. App. 2004)).

¶ 25    One of the key pieces of evidence at trial was a security video showing Johnson's purchase of the firearm at the pawnshop.  The video, which is silent, depicts

- two individuals, identified as Johnson and Trujillo, walking up to a counter in the pawnshop together;

- Trujillo examining various firearms and holding one; and

- Johnson paying for a firearm, receiving it from the pawnshop employee, and walking off with Trujillo.

¶ 26    In addition, as explained in *supra* Part I, the record establishes that Johnson was aware at the time she purchased the firearm that Trujillo could not possess it under the terms of the order for protection and because of his felony conviction.

¶ 27    Despite knowing that Trujillo could not legally possess a firearm, Johnson testified that she purchased it because of general safety concerns regarding her family, including safety concerns regarding Trujillo.  Further, Trujillo testified that Johnson stored the firearm in her closet and that, while Johnson was at work, he took the firearm, placed it in his pocket, and left the apartment.

¶ 28    The definitions of "transfer" discussed *supra* Part III.A demonstrate that section 18-12-111(1) is unambiguous because it

is not "susceptible of multiple reasonable interpretations." *People v. Raider*, 2021 COA 1, ¶ 14, ___ P.3d ___, ___. The definitions demonstrate that Johnson knowingly purchased the firearm for the purpose of "transferring" it to Trujillo. Johnson kept the firearm at a location where both she and Trujillo could access it; they shared possession of the firearm. Johnson and Trujillo "transferred" the firearm by conveying, moving, and shifting it between themselves. Thus, a "transfer" of the firearm occurred when Trujillo picked it up from the closet, where Johnson had left it.

¶ 29 We conclude that the evidence, viewed in the light most favorable to the prosecution, allowed the jury to reasonably infer that Johnson purchased the firearm with the knowledge that Trujillo, who she was aware could not lawfully possess it, would access it to protect himself. This constituted a knowing purchase of a firearm for the purpose of "transferring" it to an ineligible person under section 18-12-111(1). For these reasons, we hold there was sufficient evidence to support Johnson's conviction. *See People v. Grant*, 174 P.3d 798, 812 (Colo. App. 2007) (noting that, "where reasonable minds could differ, the evidence is sufficient to sustain a conviction").

14

## IV.    Prior Representation

¶ 30    Johnson argues that the trial court erred by allowing the prosecutor to ask Trujillo whether defense counsel had previously represented him.  She asserts that this question was irrelevant and improperly intended to create the impression that defense counsel had a conflict of interest.

### A.    Additional Background

¶ 31    During redirect examination, Trujillo denied having met Johnson's lawyer before the trial.  The prosecutor then asked Trujillo whether Johnson's lawyer had represented him at two court dates.  Before Trujillo could answer, defense counsel objected on grounds of relevance and asked to approach the bench.  Outside the presence of the jury, defense counsel expressed concern that the prosecutor was attempting to create the impression that she had a conflict of interest because she was representing Johnson after having previously represented Trujillo.  Although she objected to the prosecutor's question, defense counsel did not ask the court to advise the jurors that she did not have a conflict of interest.

¶ 32    The prosecutor responded that his question was relevant because Trujillo's prior relationship with Johnson's lawyer could

establish that Trujillo was biased towards the defense. The prosecutor argued that he should be permitted to demonstrate that this bias affected the credibility of Trujillo's testimony on cross-examination, in which he "agreed with literally everything [defense counsel] has told in detail."

¶ 33 The court expressed concern about "bringing in any association" between defense counsel and Trujillo. After the colloquy with the attorneys, the court sua sponte instructed the jurors that defense counsel did not have a conflict of interest because of her prior representation of Trujillo. After the judge gave this instruction, the prosecutor did not ask Trujillo any further questions about his previous relationship with Johnson's lawyer.

¶ 34 As Trujillo was about to step out of the witness box, defense counsel asked the court, outside the presence of the jury, whether she could ask Trujillo about her representation of him. The court agreed. Accordingly, on recross-examination, she asked Trujillo one further question: "[a]t the time that I stepped in and covered for you on your previous matter, . . . [another attorney] was actually your attorney of record . . . ?" Trujillo responded affirmatively.

## B. Any Error Resulting from the Statements Regarding Defense Counsel's Prior Representation of Trujillo Was Harmless

¶ 35   We need not determine whether the statements regarding defense counsel's prior representation of Trujillo constituted error because, even if they did, such error was harmless. *See Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 ("[R]eversal is required only if the error affects the substantial rights of the parties.").

¶ 36   We initially note that no error occurred when the prosecution asked Trujillo whether defense counsel had previously represented him. A trial court can only err by admitting evidence if evidence was actually admitted. The prosecutor's question to Trujillo about defense counsel's prior representation of him did not result in the admission of evidence because Trujillo never answered the question. *See People v. Thompson*, 950 P.2d 608, 614 (Colo. App. 1997) (holding that no evidence was introduced through the prosecutor's question because defense counsel objected before the witness could answer the question); *see also United States v. Miller*, 562 F. App'x 272, 303 (6th Cir. 2014) ("[N]o actual violation of the rules of evidence occurred here, as a lawyer's unanswered question is not evidence.").

¶ 37    The jury then learned from the *trial court* that defense counsel had previously represented Trujillo.  In response to defense counsel's assertion that the prosecutor was "trying to show some sort of a conflict," the court provided the jury with the cautionary instruction that defense counsel did not have a conflict of interest, even though defense counsel did not request such an instruction. At the time the prosecutor concluded his redirect examination of Trujillo, the jury had heard no evidence that defense counsel had previously represented him — it had only heard the prosecutor's unanswered question to Trujillo and the court's instruction noting that defense counsel's prior representation of Trujillo did not create a conflict of interest.

¶ 38    The jury did not hear any further statements regarding defense counsel's prior representation of Trujillo until *defense counsel* asked Trujillo about that representation on recross-examination.  Trujillo's response to that question shed little, if any, light on the prosecutor's assertion to the court that such brief representation gave Trujillo an incentive to testify favorably to the defense.  Although the prosecutor suggested during his colloquy with the court that defense counsel may have "spoon fed" answers

to Trujillo, the jury never heard any statement about "spoon feeding."  And the prosecutor never again referred to defense counsel's representation of Trujillo and did not mention the issue during his closing argument.

¶ 39     But, more fundamentally, Johnson's argument regarding the statements about defense counsel's prior representation of Trujillo ignores the obvious point that the jury knew that Trujillo and Johnson considered themselves married and were raising four children together.  Thus, Trujillo's alleged bias in favor of the defense resulting from defense counsel's prior representation of him paled in comparison to any bias resulting from Trujillo's marital relationship with Johnson, the defendant.  In any criminal case where a husband is called to testify against his wife and the mother of their children, jurors could reasonably conclude the husband is biased because he does not want to see his wife convicted.

¶ 40     For these reasons, the fleeting statements the jury heard about defense counsel's prior representation of Trujillo could not have "substantially influenced the verdict or affected the fairness of the trial proceedings."  *Hagos*, ¶ 12, 288 P.3d at 119 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)); *see People v. Sauser*,

2020 COA 174, ¶ 75, ___ P.3d ___, ___ (holding that any error resulting from a single, fleeting reference to inadmissible evidence was harmless). Thus, even if the court erred by allowing the jury to hear these statements, such error was harmless.

¶ 41    For the above reasons, we reject Johnson's contention that the information the jury heard about defense counsel's earlier representation of Trujillo requires reversal of her conviction.

V.    Constitutionality of Section 18-12-111(1)

¶ 42    Johnson further argues that section 18-12-111(1) is unconstitutional because it is vague on its face and as applied to her. Specifically, Johnson contends that the statute is vague on its face because the criminal code lacks a definition of "transfer." We disagree.

¶ 43    The parties agree that Johnson did not preserve her constitutional challenge to section 18-12-111(1) in the trial court but disagree whether Johnson waived the argument. Specifically, the People contend that a waiver occurred when defense counsel argued that the court should not give the jury an instruction defining "transfer." We agree with the People.

## A.    Additional Background

¶ 44    At trial, defense counsel resisted the prosecutor's attempt to provide the jury with a definition of "transfer."  During its deliberations, the jury submitted a question asking, "[W]hat is, if there is a legal definition, of a transfer of a firearm or otherwise?"  The court discussed the question with the lawyers.

¶ 45    The court advised the lawyers that it had found a definition of "transfer" in the Merriam-Webster dictionary but could not find a case defining the word.  The court suggested that it respond to the jury's question by saying, "I understand your question, but you received the instructions of law."

¶ 46    The prosecutor urged the court to instruct the jurors to use their common sense or best judgment to define "transfer."  He expressed concern about an answer to the jurors' question that suggested "transfer" lacks a definition.  The court responded that, if it provided the jurors with a definition of "transfer," they may respond with a further question — "What does that mean?"

¶ 47    The prosecutor then asked the court to give an instruction on "the everyday meaning or something to that extent."  Defense counsel opposed this suggestion, asserting that the court should

21

tell the jurors, "you have been given all the instructions as is."  The court said it would instruct the jurors "there is no statutory definition of transfer in the context of transfer of a firearm. . . . [T]hey have received the instructions they may use."

¶ 48     The prosecutor responded that, based on *Leonardo v. People*, 728 P.2d 1252 (Colo. 1986), "if the jury asks a question that shows it does not understand an element or some other matter of law central to the case, the trial court has an obligation to clarify the matter in a concrete and unambiguous manner."  However, the court concluded that, in the absence of a statutory definition of "transfer," it could not provide the jurors with more concrete guidance regarding the meaning of the word.

### B.     Waiver

¶ 49     A waiver is "the *intentional* relinquishment of a *known* right or privilege."  *People v. Rediger*, 2018 CO 32, ¶ 39, 416 P.3d 893, 902 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)).  We do not review waived arguments.  *Id.* at ¶ 40, 416 P.3d at 902.

¶ 50     In contrast, the forfeiture of a right can occur through neglect and does not extinguish an error.  *Id.*  We review forfeited errors for

plain error. *Id.* "Plain error is obvious and substantial. We reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself as to cast serious doubt on reliability of the judgment of conviction.'" *Hagos*, ¶ 14, 288 P.3d at 120 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

¶ 51    Here, defense counsel expressly rejected the prosecutor's suggestion that the court provide the jury with a definition of "transfer." Although defense counsel acknowledged that section 18-12-111(1) lacks a definition of "transfer," she argued against providing the jury with a definition of the word.

¶ 52    Defense counsel's statements in opposition to a further jury instruction on the meaning of "transfer" went beyond a "rote statement that [counsel] is not objecting." *People v. Tee*, 2018 COA 84, ¶ 37, 446 P.3d 875, 883 (quoting *United States v. Zubia-Torres*, 550 F.3d 1202, 1207 (10th Cir. 2008)); *see People v. Forgette*, 2021 COA 21, ¶ 32, ___ P.3d ___, ___ (concluding that "counsel's failure to request relief for the known defect of a sleeping juror constitutes waiver"); *Tee*, ¶¶ 25-42, 446 P.3d at 881-84 (holding that a waiver occurred where defense counsel knew the jurors engaged in predeliberation, which raised constitutional concerns, but chose not

to seek a mistrial); *People v. Kessler*, 2018 COA 60, ¶ 36, 436 P.3d 550, 558 (determining that defense counsel waived his appellate argument because he did not object or otherwise argue that the result of a breathalyzer test was inadmissible at trial); *cf. Phillips v. People*, 2019 CO 72, ¶ 22, 443 P.3d 1016, 1023 (holding that no waiver occurred where the record was "barren of any indication that defense counsel considered raising the unpreserved contentions before the trial court but then, for a strategic or any other reason, discarded the idea").

¶ 53    The record here is not "barren of any indication that defense counsel considered raising," *Phillips*, ¶ 22, 443 P.3d at 1023, the argument that, in the absence of a definition of "transfer," section 18-12-111(1) is unconstitutionally vague.  Defense counsel could have sought to remedy this alleged deficiency by proposing a jury instruction containing a definition of "transfer" amenable to Johnson.  But defense counsel did not even attempt to persuade the court to adopt a definition of the word.

¶ 54    Rather, when the court asked for the defense's position on a possible definitional instruction, defense counsel responded, "[m]y position is you have been given all the instructions as is."  Defense

counsel's position on defining "transfer" for the jury was not the result of mere neglect but was intentional. Therefore, we conclude that Johnson waived her argument regarding the constitutionality of section 18-12-111(1) by intentionally relinquishing a known right and, specifically, by urging the court not to provide the jurors with a definition of "transfer."

¶ 55    Even if Johnson did not waive this argument, we conclude the court did not plainly err by not giving the jury a definition of "transfer." *See Hagos*, ¶ 14, 288 P.3d at 120; *People v. Conyac*, 2014 COA 8M, ¶ 54, 361 P.3d 1005, 1020 ("Under the plain error standard, the defendant bears the burden to establish that an error occurred, and that at the time the error arose, it was so clear cut and so obvious that a trial judge should have been able to avoid it without benefit of objection."). Because we hold *supra* Part III.B that the language of the statute is unambiguous, any error in not providing the jury with an instruction defining "transfer" was not "so clear cut and obvious" that the trial court should have disregarded Johnson's argument against providing the jury with such an instruction and giving the jury a definition of "transfer."

## VI. Conclusion

¶ 56 The judgment of conviction is affirmed.

JUDGE ROMÁN and JUDGE HARRIS concur.