23CA1630 Peo v Plascencia 03-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1630
Weld County District Court No. 19CR2678
Honorable Allison J. Esser, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Damaige Dominic Plascencia,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 20, 2025

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mulligan Breit, LLC, Patrick J. Mulligan, Denver, Colorado, for Defendant-Appellant

¶ 1    Damaige Dominic Plascencia appeals his conviction for sexual assault (victim was helpless and had not consented). We affirm.

## I.    Background

¶ 2    A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3    The victim, A.R., and A.R.'s boyfriend, Mark Couch, went to a bar together. At the bar, they met Plascencia; Plascencia's cousin, Christopher Lucero; and Lucero's girlfriend. Couch became "aggravated" when a woman celebrating her birthday at the bar asked A.R. for a "birthday kiss" and the two women kissed. A bouncer asked Couch to leave because he was "being loud."

¶ 4    A.R., Couch, Plascencia, Lucero, and Lucero's girlfriend left the bar together. By that time, Couch was intoxicated and A.R. was the "drunkest" Couch had "ever seen her." Because A.R. and Couch were too intoxicated to drive, Couch got in Lucero's truck and Plascencia drove A.R. in A.R.'s car.

¶ 5    The group drove to a hotel for an afterparty but soon left to purchase a bottle of alcohol. They decided to get together at Lucero's apartment.

¶ 6    Instead of driving directly to Lucero's apartment, however, Plascencia "drove around for a while" with A.R.  During that time, Plascencia grabbed A.R.'s face and attempted to kiss her.  She repeatedly told him to stop.  Plascencia then drove A.R. to his mother's house, in which he lived, and took A.R. to a basement bedroom.  A.R. lost consciousness.  While A.R. was unconscious, Plascencia engaged in sex with her and photographed her naked body.  When A.R. regained consciousness, she saw Plascencia pull up his pants and heard his cell phone ring.  A.R. could hear Lucero and Couch on Plascencia's phone "loudly" ask Plascencia where he was.  After the call, Plascencia helped A.R. walk up the stairs "because [she] kept tripping."  The two got in A.R.'s car, and Plascencia drove to the parking lot of Lucero's apartment building.

¶ 7    A.R. testified that, "[a]s soon as [they] got into the parking lot and [Plascencia] parked, [he] took off his shirt and started bouncing up and down with his fists."  After Plascencia walked toward Lucero and Couch, A.R. "started to hear physical contact."  Because the passenger door to A.R.'s car was stuck, she "crawled out through [a] window."

2

¶ 8    Couch testified that, after Plascencia stepped out of A.R.'s car, Couch "got hit blindsided from the back." He said that the blow "was hard enough" to "knock[] [him] to the ground." Couch looked up and saw Plascencia and Lucero standing over him and hitting him. After Plascencia and Lucero left the parking lot, A.R. helped Couch get into her car's passenger seat. She drove them back to her apartment. They arrived around five in the morning and "basically stayed in bed all day."

¶ 9    When the couple woke up, A.R. saw that she had received a text message from Plascencia saying, "Hey it's [Plascencia] from the bar." A.R. responded with a text message saying,

> You lowlife piece of shit. What the fuck did you guys do to us. You knew I was with [Couch] and u took advantage of me anyway, I remember pleading with you to stop. And then you guys hit [Couch] for no reason. We were a happy couple and now I have to live with what happened last night. No fucking respect.

¶ 10    A.R. and Couch called the police the next day. Officers "escorted [A.R. and Couch] to the hospital," where a sexual assault nurse examiner (SANE) collected biological and physical evidence from A.R. The SANE turned over the evidence to the police.

3

¶ 11    A Colorado Bureau of Investigation forensic scientist, Jodie Callen, compared the DNA the SANE collected from A.R. with DNA obtained from Plascencia.  Callen testified that her analysis showed the two mixed-DNA profiles were "approximately twelve octillion times more likely" to have "originated from [A.R.] and [Plascencia] than . . . from [A.R.] and another unknow[n], unrelated individual." She opined that such analysis "provide[d] very strong support that [Plascencia] [wa]s a contributor to these DNA mixtures."

¶ 12    Plascencia was charged with five counts of sexual assault related to his acts against A.R. and two counts of second degree assault related to his acts against Couch:

(1)    sexual assault (victim incapable of appraising the nature of the victim's conduct), in violation of section 18-3-402(1)(b), C.R.S. 2024, a class 4 felony, § 18-3-402(2);

(2)    sexual assault (victim incapable of appraising the nature of the victim's conduct — submission by physical force or physical violence), in violation of section 18-3-402(1)(b), a class 3 felony, § 18-3-402(4)(a);

(3)	sexual assault (causing submission against victim's will), in violation of section 18-3-402(1)(a), a class 4 felony, § 18-3-402(2);

(4)	sexual assault (causing submission — by physical force or physical violence — against victim's will), in violation of section 18-3-402(1)(a), a class 3 felony, § 18-3-402(4)(a);

(5)	sexual assault (victim helpless and has not consented), in violation of section 18-3-402(1)(h), a class 3 felony, § 18-3-402(3.5);

(6)	second degree assault, in violation of section 18-3-203(1)(g), C.R.S. 2024, a class 4 felony, § 18-3-203(2)(b); and

(7)	second degree assault (during the commission or attempted commission of or flight from the commission or attempted commission of sexual assault), in violation of section 18-3-203(1)(g), a class 3 felony, § 18-3-203(2)(b.5).

¶ 13	At trial, the court granted the prosecution's motion to dismiss the third and fourth counts. In addition, the court dismissed the

5

seventh count after the defense filed a motion for a judgment of acquittal on that count because the court said it did not find that "any kind of flight behavior motivated the assault."

¶ 14    The jury convicted Plascencia of the fifth count — sexual assault (victim was helpless and had not consented). It acquitted him of the first and second counts — sexual assault (victim incapable of appraising the nature of the victim's conduct) — and the sixth count — second degree assault. The court sentenced Plascencia to twenty years in the custody of the Department of Corrections.

¶ 15    On appeal, Plascencia contends that (1) the evidence was insufficient to disprove his affirmative defense of consent; (2) the court abused its discretion by admitting an unreliable and unauthenticated machine-generated report of the contents of Plascencia's phone (the Plascencia phone report), inadmissible hearsay including the Plascencia phone report and an officer's testimony regarding the Plascencia phone report, and certain photos and text messages downloaded from Plascencia's phone; and (3) the court abused its discretion by admitting evidence that, shortly before the sexual assault, A.R. had experienced a

miscarriage and undergone a dilation and curettage (D&C) procedure. Lastly, Plascencia argues that we should reverse his conviction for cumulative error.

## II. Analysis

### A. The Evidence Admitted at Trial Was Substantial and Sufficient to Support Plascencia's Conviction

#### 1. Standard of Review

¶ 16 "[S]ufficiency of the evidence claims may be raised for the first time on appeal and are not subject to plain error review." *McCoy v. People*, 2019 CO 44, ¶ 27, 442 P.3d 379, 387. Accordingly, appellate courts should review unpreserved and preserved sufficiency claims de novo. *Id.* Specifically, "we review the record de novo to determine whether the prosecution has met its burden of proof with respect to each element of the crime charged." *Martinez v. People*, 2015 CO 16, ¶ 22, 344 P.3d 862, 869.

¶ 17 "We consider 'whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *McCoy*, ¶ 63, 442 P.3d at

392 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)). "In applying this test, we are required to 'give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence.'" *People v. Harrison*, 2020 CO 57, ¶ 32, 465 P.3d 16, 23 (quoting *People v. Perez*, 2016 CO 12, ¶ 25, 367 P.3d 695, 701).

¶ 18     In considering the sufficiency of the evidence introduced at trial, we may not act as a thirteenth juror to "substitute [our] judgment for that of the jury and reweigh the evidence or the credibility of witnesses." *People v. Johnson*, 2021 COA 102, ¶ 24, 498 P.3d 157, 162 (quoting *People v. Poe*, 2012 COA 166, ¶ 14, 316 P.3d 13, 16), *aff'd on other grounds*, 2023 CO 7, ¶ 24, 524 P.3d 36, 41; *People v. Gonzalez-Quezada*, 2023 COA 124M, ¶ 11, 546 P.3d 142, 147. "It is the fact finder's role to weigh the credibility of witnesses, to determine the weight to give all parts of the evidence, and to resolve conflicts, inconsistencies, and disputes in the evidence." *Johnson*, ¶ 24, 498 P.3d at 162 (quoting *Poe*, ¶ 14, 316 P.3d at 16).

## 2. The Law Governing Sexual Assault and the Affirmative Defense of Consent

¶ 19 To convict a defendant of sexual assault in violation of section 18-3-402(1)(h), a prosecutor must prove beyond a reasonable doubt that the defendant "knowingly inflict[ed] sexual intrusion or sexual penetration" on the victim, that the victim was "physically helpless," and that the defendant knew the victim was "physically helpless and . . . ha[d] not consented."

¶ 20 Consent is a statutory affirmative defense. § 18-1-505(1), (4), C.R.S. 2024. "In asserting an affirmative defense, a defendant admits to the conduct that gives rise to the charged offense." *Pearson v. People*, 2022 CO 4, ¶ 18, 502 P.3d 1003, 1007. "[W]hen a defendant properly raises an affirmative defense, the nonapplicability of the defense effectively becomes an element of the offense that the People must prove beyond a reasonable doubt." *People v. DeGreat*, 2018 CO 83, ¶ 19, 428 P.3d 541, 544.

¶ 21 "Consent has a specialized meaning in the context of sexual assault." *People v. Garcia*, 2012 COA 79, ¶ 38, 296 P.3d 285, 291. "'Consent' means cooperation in act or attitude pursuant to an

exercise of free will and with knowledge of the nature of the act." § 18-3-401(1.5), C.R.S. 2024.

### 3. The Evidence Introduced at Plascencia's Trial

¶ 22 Plascencia's theory of defense at trial was that A.R. consented to have sex with him. He contends that the prosecution failed to introduce sufficient evidence to disprove his affirmative defense of consent and, therefore, to convict him of sexual assault of a helpless victim who had not consented.

¶ 23 Plascencia specifically argues that A.R.'s testimony that she did not consent to have sex with him was "inconsistent with the overwhelming evidence to the contrary." Plascencia supports his sufficiency argument by noting the following evidence of A.R.'s alleged consent:

- A.R. "admitted on multiple occasions that she was not even certain there had been a sexual encounter."

- She "admitted that she had exchanged phone numbers with [Plascencia] before the sexual encounter."

- A.R. "acknowledged a photo taken with [Plascencia]" before the assault "where [they] both appeared to be happy."

10

- A.R. "agreed that she allowed [Plascencia] to drive[] her car, and that she willingly agreed to accompany him on the drive."

- Defense witnesses testified that A.R. "kissed and 'made out' with [Plascencia] consensually before the sexual encounter" and "described [A.R.] and [Plascencia] as being 'all over' each other prior to the sexual interlude."

- A defense witness said that, as A.R. and Plascencia were leaving the hotel parking lot, A.R. asked the witness for a condom.

- Plascencia's mother testified that "she did not see [A.R.] stumble, and did not observe [A.R.] to be intoxicated" but that she "heard the two laughing from the basement, and noticed them smiling when they came back up the stairs."

- A.R. and Couch "waited more than 24 hours before finally deciding to contact the police."

¶ 24 In light of the evidence that the prosecution presented at trial, we disagree there was insufficient evidence to disprove Plascencia's consent defense.

¶ 25 The prosecution presented the following evidence to prove that Plascencia sexually assaulted A.R. in violation of section 18-3-402(1)(h) and to disprove Plascencia's affirmative defense of consent:

- Plascencia kneeled next to A.R., "started to rub [her] legs," and tried to touch her "chest area" while she was seated on the couch in the basement of Plascencia's home.

- A.R. "told [Plascencia] to please stop" touching her and "shoved him" when he ignored her requests.

- When Plascencia took a phone call, A.R. "took [the] opportunity to go into the bathroom that was in the living room." She locked the door and tried to vomit because she felt that she "really needed to sober up."

- When A.R. stepped out of the bathroom, Plascencia "grabbed [A.R.] by the arm" and led her "down a hallway" into a bedroom. As he did so, A.R. "continuously" said to him, "[P]lease let me go. I don't want to do this. I would like to leave."

- Once in the bedroom, Plascencia "[t]ried to remove [A.R.'s] pants." She "snapped one of [her] nails off" while trying to "hold[] onto [her] pants so [Plascencia] couldn't take them off."

- Plascencia pushed A.R. onto a bed as she was "struggling to[] keep [her] pants on."

- A.R. testified that she did not consent that Plascencia could remove her clothing, touch her breast or vagina, or penetrate her vagina with his penis. She asserted that she never said "anything to [Plascencia] to communicate that [she] wished to engage in an intimate encounter with him" but, rather, "communicate[d] the opposite."

- A.R. "lost consciousness" when Plascencia pushed her onto the bed.

- As explained further below, law enforcement officers found on Plascencia's phone multiple photographs depicting A.R. unconscious and unclothed while lying on the bed. (Because the photos are not included in the appellate record due to their sensitive nature, we rely on their undisputed description in the record.)

13

- The next thing A.R. recalled was Plascencia "shaking [her] that [she] needed to get up" and "pulling up his pants."

- A.R. realized that her underwear and pants "were gone," she "could feel something running down [her] leg," and she "could smell semen."

- A.R. told Plascencia to "get me back to [Couch]. I don't know where you're taking me. I need to get back to [Couch]. I'm in love with [Couch]."

- A.R. testified that she "shoved [Plascencia] every time that he would make contact with [her] physically" and told him to "take [her] back" to Couch and the others.

¶ 26    Plascencia fails to acknowledge the evidence establishing that he inflicted sexual penetration on A.R. while she was physically helpless, despite knowing that she was physically helpless and had not consented. A.R. testified that she told Plascencia multiple times that she did not consent. In addition, the jury heard evidence that A.R. was unconscious when Plascencia sexually penetrated her and that she consistently resisted his advances. This evidence was

14

sufficient for a reasonable jury to reject Plascencia's consent defense.

¶ 27     In addition, even if we were to assume that some of A.R.'s actions earlier on the night of the incident suggested that she was willing to engage in sex or consented to engage in sex with Plascencia, she was entitled to withdraw that consent. *See State v. Baby*, 946 A.2d 463, 482-83 (Md. 2008); *In re John Z.*, 60 P.3d 183, 187 (Cal. 2003) ("Nothing in . . . the case law suggests that the defendant is entitled to persist in intercourse once his victim withdraws her consent."); *McGill v. State*, 18 P.3d 77, 84 (Alaska Ct. App. 2001); *State v. Malcolm*, 2023 SD 6, ¶ 27, 985 N.W.2d 732, 739. Further, "a man who intentionally engages in sexual intercourse with a woman he knows to be unconscious is clearly aware that he is wrongfully depriving the woman of her right to withhold her consent to the act at the time of penetration." *People v. Dancy*, 124 Cal. Rptr. 2d 898, 910 (Ct. App. 2002). "[N]either a woman's actual 'advance consent' nor a man's belief in 'advance consent' could possibly eliminate the wrongfulness of the man's conduct in knowingly depriving the woman of her freedom of choice both at the initiation of and during sexual intercourse." *Id.* at 911.

¶ 28    When viewing the evidence in the light most favorable to the prosecution, we conclude that the prosecution introduced substantial and sufficient evidence to sustain Plascencia's conviction for sexual assault and to disprove Plascencia's affirmative defense of consent.

B.    The Prosecution Sufficiently Established the Reliability and Authenticity of the Plascencia Phone Report

1.    Additional Facts

¶ 29    Detective Brian Hunziker of the Greeley Police Department, the lead investigator for Plascencia's case, testified that he seized Plascencia's phone about one month after A.R. and Couch called the police. Detective Hunziker asked Detective Andrew Gilmore, an electronic surveillance specialist, to download the contents of Plascencia's phone.

¶ 30    Detective Gilmore testified at trial regarding Cellebrite, software he uses to "analyze and extract data from cellphones." He said that he was one of the few people in the Greeley Police Department trained to use Cellebrite. Detective Gilmore explained that a person using Cellebrite connects the phone to the Cellebrite

device and then follows "onscreen prompts" that "walk [the operator] through [the] extraction process."

¶ 31     After the court qualified Detective Gilmore as an expert in cell phone extraction and Cellebrite downloads, he further testified that, after he plugs a phone into Cellebrite, he uses its "autodetect" feature to ensure that Cellebrite correctly identified the type of phone.  Once Cellebrite recognizes the phone, it provides the operator with download options.

¶ 32     Detective Gilmore testified that Cellebrite provides "three types of extractions" for downloading phone contents, including an "advanced logical" extraction option.  An "advanced logical" extraction creates a ninety-nine percent mirror image of the phone's contents, which Cellebrite displays on a screen.  The screen shows folders that "tell[] you what's contained in [the phone] whether it be phone messages, call logs, [or] pictures."  He said that he conducted an "advance[d] logical" extraction to download the contents of Plascencia's phone.

¶ 33     After Detective Gilmore extracted Plascencia's phone's contents, he ran the extraction through "a secondary system also by Cellebrite called Physical Analyzer," which creates a report of

17

"the information pulled from the phone." Detective Gilmore provided Detective Hunziker with an electronic copy of the Plascencia phone report, which Detective Gilmore did not review, and downloaded a second copy onto a CD "that went [in]to evidence."

¶ 34 The prosecution offered into evidence "the CD copy of the report that was generated by [Detective Gilmore's] download" to lay a foundation for Detective Hunziker's testimony later in the case. The court initially admitted the Plascencia phone report into evidence "for foundational purposes only."

¶ 35 The next day, the prosecution offered into evidence the content of the text messages extracted from Plasencia's phone (the text messages). Defense counsel objected to the admission of the text messages for lack of foundation and hearsay, asserting that the exhibits contained "extraneous information" because the text messages were part of a "much larger conversation," and "we don't know who sent them." After the prosecutor explained that the text messages were "statements by a party opponent" downloaded from Plascencia's phone, the court admitted them into evidence.

¶ 36    When the prosecution called Detective Hunziker to testify, defense counsel objected to his testimony about the Plascencia phone report and the text messages because he "did not do th[e] [Cellebrite] extraction" and could not verify the accuracy of time stamps on the text messages. The court overruled defense counsel's objection.

### 2.    Preservation and Standard of Review

¶ 37    Defense counsel did not expressly object on the grounds that the Plascencia phone report was unreliable and inauthentic. Although a close call, we believe that defense counsel's objections to admission of the text messages into evidence and to Detective Hunziker's testimony were sufficient to preserve Plascencia's challenge to the reliability and authenticity of the Plascencia phone report. In particular, defense counsel's assertion that Detective Hunziker could not testify regarding the contents of the Plascencia phone report because he "did not do th[e] [Cellebrite] extraction" called into question the Plascencia phone report's authenticity. "Raising the 'sum and substance' of an argument is sufficient to preserve it" for appellate review. *People v. Cooley*, 2020 COA 101,

19

¶ 24, 469 P.3d 1219, 1224 (quoting *In re Estate of Ramstetter*, 2016 COA 81, ¶ 68, 411 P.3d 1043, 1053).

¶ 38     "We review evidentiary rulings for an abuse of discretion." *People v. Dominguez-Castor*, 2020 COA 1, ¶ 51, 469 P.3d 514, 525. "A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or . . . if it misapplies the law." *People v. Montoya*, 2024 CO 20, ¶ 47, 546 P.3d 605, 616.

### 3.     The Plascencia Phone Report's Reliability and Authenticity

¶ 39     Plascencia argues on appeal, as he did in the trial court, that neither of the detectives possessed sufficient knowledge to authenticate the Plascencia phone report.

### a.     Reliability

¶ 40     "The reliability of machine-generated records can be established 'through the testimony of the operator of the machine or any other relevant evidence.'" *People v. Hamilton*, 2019 COA 101, ¶ 33, 452 P.3d 184, 193-94 (quoting *Thomas v. People*, 895 P.2d 1040, 1045 (Colo. 1995)). "The proponent of the admissibility of computer-generated evidence must lay a sufficient foundation to establish that the machine's results are valid and reliable, the machine was in proper working order at the time it generated the

20

report, and the operator was qualified to operate it." *Id.* at ¶ 34, 452 P.3d at 194; *see also Thomas*, 895 P.2d at 1045.

¶ 41 Notably, the detective who testified in *Hamilton* did not identify the tool that "[t]he people" in their "police technical unit" had employed to download the contents of the defendant's and victim's respective cell phones and to generate the reports reflecting the phones' contents. ¶ 29, 452 P.3d at 193. The detective merely testified that "[t]he people that we have downloaded that information in our police technical unit" and said he was testifying about "[a] report from [the defendant's] phone being downloaded." *Id.* "Rather than offer the [r]eports themselves into evidence," the prosecutor put the detective "on the witness stand to tell the jury what the [r]eports said." *Id.* Under these circumstances, the division concluded that the prosecution had not laid a proper foundation for admission of the reports' content into evidence because the detective did not explain the process used to extract the phones' contents or identify the tool used to conduct the extraction. *See id.* at ¶¶ 39-40, 452 P.3d at 194.

¶ 42 Detective Gilmore's testimony regarding how Cellebrite works and his use of Cellebrite to extract the contents of Plascencia's

phone was materially different from the detective's vague testimony in *Hamilton.* Detective Gilmore explained that he was trained in the use of Cellebrite, testified in detail how an operator uses Cellebrite to extract cell phone data, and said that he followed such process to download the contents of Plascencia's phone.

¶ 43 For these reasons, we conclude that Detective Gilmore's testimony was sufficient to establish the Plascencia phone report's reliability.

### b. Authenticity

¶ 44 "Authentication is a condition precedent to admissibility of evidence." *Dominguez-Castor,* ¶ 53, 469 P.3d at 525. "The burden to authenticate 'is not high — only a prima facie showing is required.'" *Gonzales v. People,* 2020 CO 71, ¶ 27, 471 P.3d 1059, 1064 (quoting *People v. Glover,* 2015 COA 16, ¶ 13, 363 P.3d 736, 740).

> Because the [authenticity] rule's plain language instructs that a proponent need only provide sufficient evidence to support a finding that the proffered evidence is what the proponent claims, the rule vests trial courts with broad discretion to consider a variety of foundational circumstances depending on the nature of the proffered evidence.

*Id.* at ¶ 30, 471 P.3d at 1064. "Accordingly, the trial court, as the evidentiary gatekeeper, must determine 'whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic.'" *Id.* at ¶ 27, 471 P.3d at 1064 (quoting *Glover*, ¶ 13, 363 P.3d at 740).

¶ 45 "Once the proponent meets this burden, the actual authenticity of the evidence and the effect of any defects go to the weight of evidence and not its admissibility." *People v. N.T.B.*, 2019 COA 150, ¶ 16, 457 P.3d 126, 130. This shift from admissibility to the weight of the evidence is consistent with the determination that a prima facie showing of authenticity, "combined with rigorous cross-examination, sufficiently assures accuracy to submit the question of authenticity to the jury." *Gonzales*, ¶ 42, 471 P.3d at 1067.

¶ 46 Plascencia relies on *Hamilton* to argue that Detective Hunziker "could not attest" to the Plascencia phone report's authenticity because he "did not perform the download or create the report." However, as noted above, in *Hamilton*, the testifying detective provided *no information* regarding the process that "[t]he people . . . in [his] police technical unit" had employed to extract data from the

23

two cell phones and did not identify the tool used for the extraction. ¶¶ 29-40, 452 P.3d at 193-94.

¶ 47 In contrast, Detective Gilmore explained in detail how he extracted the contents of Plascencia's phone and created the Plascencia phone report. We agree with the reasoning of *People v. Abad*, 2021 COA 6, ¶ 50, 490 P.3d 1094, 1104, which illustrates why this testimony was sufficient to authenticate the Plascencia phone report.

¶ 48 In *Abad*, the prosecution offered into evidence Cellebrite-generated reports that reflected the contents of two cell phones. *Id.* at ¶ 44, 490 P.3d at 1103. Although the detective who completed the Cellebrite extraction in *Abad* did not testify, a different detective explained that "the police use a software called Cellebrite to download the data and create the extraction reports." *Id.* Two other officers testified that they knew data from one of the phones "had been downloaded and an extraction report prepared," and one of those officers assisted with the download from the other phone. *Id.* The detective and the two officers testified at length about the extraction reports. *Id.* The division held that, "[g]iven the minimal showing required" to authenticate evidence, the officers'

testimony was sufficient to establish that the phone extraction reports "were what the prosecution claimed they were — data downloaded" from the phones. *Id.* at ¶ 45, 490 P.3d at 1103-04.

¶ 49    Detective Gilmore's detailed testimony regarding Cellebrite is akin to the testimony in *Abad*. Unlike in *Hamilton*, the prosecution introduced substantial evidence regarding Detective Gilmore's qualifications and the process he used to extract the data from Plascencia's phone and to generate the Plascencia phone report. Moreover, Detective Gilmore provided a complete, unbroken chain of custody for Plascencia's phone. *See People v. Brown*, 313 P.3d 608, 614 (Colo. App. 2011) ("To authenticate real evidence, the proponent need only establish a chain of custody, that is, 'that the evidence was involved in the incident and that the condition of the evidence at trial is substantially unchanged.'" (quoting *People v. Herrera*, 1 P.3d 234, 240 (Colo. App. 1999))). Accordingly, the prosecution met its burden to establish the Plascencia phone report's authenticity. *See Abad*, ¶ 45, 490 P.3d at 1103-04.

## C. Neither the Plascencia Phone Report nor Detective Hunziker's Testimony About the Report Was Hearsay

¶ 50 Plascencia argues that the court erred by admitting the Plascencia phone report into evidence and allowing Detective Hunziker to testify about the report because both constituted hearsay. We disagree.

### 1. Preservation and Standard of Review

¶ 51 Defense counsel did not raise hearsay objections to the admission of the Plascencia phone report or Detective Hunziker's testimony about the Plascencia phone report. Plascencia argues that he nonetheless preserved his hearsay argument regarding the Plascencia phone report by citing defense counsel's objection to the admission of a portion of a photo log that appeared in the report. But that objection consisted of defense counsel's assertion that the admission of the photo log would unfairly prejudice Plascencia.

¶ 52 Plascencia argues that defense counsel preserved the argument that Detective Hunziker's testimony about the Plascencia phone report was hearsay through a hearsay objection during Detective Hunziker's testimony. However, that objection focused on the alleged lack of information regarding the senders and recipients

of text messages that appeared in the Plascencia phone report and the accuracy of timestamps on the text messages.

¶ 53     Because defense counsel did not raise hearsay objections to the Plascencia phone report or to Detective Hunziker's testimony regarding the Plascencia phone report, Plascencia did not preserve his argument that they were hearsay.  *See* C.A.R. 28(a)(7)(A).

¶ 54     Although we review preserved arguments regarding the admission of evidence for an abuse of discretion, we review de novo the legal question of "whether a given statement constitutes hearsay."  *People v. Schnorenberg*, 2023 COA 82, ¶ 10, 541 P.3d 1, 4 (*cert. granted* May 28, 2024).  We review unpreserved evidentiary arguments for plain error.  *See Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120.  "Plain error is obvious and substantial."  *Id.*

¶ 55     We reverse for plain error only if "the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'"  *Id.* (quoting *People v. Miller*, 113 P.3d 743, 748-50 (Colo. 2005)).

## 2.     Hearsay

¶ 56     "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence

to prove the truth of the matter asserted." CRE 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by [the person] to be communicative." CRE 801(a). "Hearsay is not admissible except as provided by [the Colorado Rules of Evidence] or by the civil and criminal procedural rules applicable to the courts of Colorado or by any statutes of the State of Colorado." CRE 802.

### a.    The Plascencia Phone Report Was Not Hearsay

¶ 57    The Plascencia phone report was not hearsay because it was machine-generated and because the court did not admit it for the truth of the matter asserted.

¶ 58    "Information automatically generated by machines is not hearsay because no 'person' or 'declarant' made a 'statement' within the meaning of CRE 801." *Abad*, ¶ 54, 490 P.3d at 1105; *People v. Buckner*, 228 P.3d 245, 250 (Colo. App. 2009).

¶ 59    Plascencia argues that the Plascencia phone report "involve[d] human input or interpretation," and therefore, under *Hamilton*, it "constitute[d] hearsay." However, in *Hamilton*, the division held that the reports at issue were not machine-generated because the

28

prosecution did not establish that they were created without human input or interpretation.  *See* ¶¶ 24-26, 452 P.3d at 192-93.

¶ 60    In contrast, Detective Gilmore's testimony established that Cellebrite generated the Plascencia phone report without his input or interpretation.  He explained that he extracted the contents of Plascencia's phone merely by connecting it to the Cellebrite device, selecting "autodetect," and choosing the "advanced logical extraction" option.  He said that he did not place any parameters on the extraction and that he generated the Plascencia phone report by running the extracted contents of Plascencia's phone through "Physical Analyzer," Cellebrite's secondary system.

¶ 61    Because Detective Gilmore generated the Plascencia phone report without human input or interpretation, it was machine-generated and, therefore, not hearsay.  *See Abad*, ¶ 56 n.5, 490 P.3d at 1105 n.5 ("Unlike *Hamilton*, we conclude that there was sufficient evidence for the district court to conclude that the extraction reports in this case were computer generated without human input or interpretation."); *see Buckner*, 228 P.3d at 250 ("[S]everal other jurisdictions — applying definitions substantially similar to those in our own hearsay rules — have concluded that

information automatically generated by machines is not hearsay. . . . [T]he logic underlying those decisions is that such information involves neither a 'declarant' nor a 'statement' within the meaning" of the hearsay rules.) (citations omitted).

¶ 62     In addition, the Plascencia phone report was not hearsay because the court admitted it "for foundational purposes only" and not for the truth of the matters asserted in it.  The prosecution offered a CD containing the Plascencia phone report into evidence to lay a foundation for "Detective Hunziker['s] testimony later in the case" about the information downloaded from Plascencia's phone.

¶ 63     Because the Plascencia phone report was not offered for its truth, it was not hearsay, regardless of whether it was machine-generated.  *See People v. Thompson*, 2017 COA 56, ¶ 135, 413 P.3d 306, 329 ("[I]f an out-of-court statement is not offered for its truth, it is admissible as nonhearsay evidence as long as it is relevant to the issues presented.").

¶ 64     For these reasons, the court did not abuse its discretion by admitting the Plascencia phone report into evidence.

b. Detective Hunziker's Testimony Was Not Hearsay

¶ 65 Plascencia contends that, because the Plascencia phone report was hearsay, Detective Hunziker's testimony regarding the report was "hearsay within hearsay." We disagree.

¶ 66 As explained above, the Plascencia phone report was not hearsay; thus, we turn to whether Detective Hunziker's testimony was inadmissible hearsay.

¶ 67 Plascencia argues that, like the prosecution in *Hamilton*, the prosecution in his case "compounded the hearsay problem by introducing the contents of the [Plascencia phone] report" through Detective Hunziker's testimony. But the facts in *Hamilton* were materially different from the facts in this case. In *Hamilton*, a sexual assault case, the defendant supported his consent defense by asserting that he and the victim had exchanged text messages. *See* ¶¶ 8, 43-44, 452 P.3d at 190, 195. Thus, the phone-related issue in *Hamilton* concerned whether the defendant's and the victim's respective phones contained text messages between the two of them.

¶ 68 In *Hamilton*, unlike here, the prosecution did not offer into evidence the reports containing the downloads of the two phones.

*Id.* at ¶ 29, 452 P.3d at 193.  Rather, the prosecution called an officer to testify that he had reviewed the reports and that no text messages between the defendant and the victim were found on either phone.  *Id.* at ¶ 9, 452 P.3d at 190.  The division held that the officer's testimony about the reports was hearsay because the officer "described to the jury the content of the [r]eports to prove the truth of their content."  *Id.* at ¶ 30, 452 P.3d at 193.

¶ 69     In contrast, after the court admitted the Plascencia phone report into evidence for foundational purposes only, Detective Gilmore testified that he provided the Plascencia phone report to Detective Hunziker, and Detective Hunziker testified that he examined the phone and the Plascencia phone report.  Detective Hunziker did not describe the Plascencia phone report to establish the truth of its contents — or, as in *Hamilton*, to establish what was not contained in it.  Rather, Detective Hunziker merely identified certain photos and text messages that appeared in the Plascencia phone report to lay a foundation for their admission into evidence.

¶ 70     For these reasons, Detective Hunziker's testimony about the Plascencia phone report was not hearsay.  *See* CRE 801(c).

Accordingly, the court did not err by allowing Detective Hunziker to testify about the Plascencia phone report.

### D. The Court Did Not Err by Admitting into Evidence Photos and Text Messages Downloaded from Plascencia's Phone

¶ 71    Plascencia argues that the court abused its discretion by admitting into evidence photos and text messages downloaded from Plascencia's phone. Before we analyze this argument on the merits, we examine whether Plascencia preserved his objections to the admission of the photos and text messages into evidence.

### 1.    Additional Facts

¶ 72    The prosecution moved to admit into evidence a portion of the Plascencia phone report containing part of a photo log. The log included photos depicting A.R. unconscious and unclothed on a bed. (A.R. testified that she only became aware of the photos "during the lead up to [Plascencia's] trial" and that she "[n]ever" gave Plascencia "consent to photograph [her] in a state of undress." A.R. identified herself in the photos from her tattoos, her "red shirt," and a birthmark.) Some of the photos in the log marked as the prosecution's Exhibit 43 were blacked out because, as the prosecutor explained, the prosecution presumed defense counsel

would want them "blacked out" to avoid prejudice to Plascencia. (The blacked-out photos were apparently irrelevant to the case.) The prosecutor's Exhibit 9 consisted of the same photo log without any photos blacked out.

¶ 73 Defense counsel objected to the admission of Exhibit 43 on grounds of unfair prejudice because "[t]he blacking out . . . makes [the jury] wonder . . . what other pictures are on there." The court declined to admit prosecution Exhibits 9 and 43 into evidence because it did not "understand the relevance to the jury seeing the pictures as they appeared" in a "gallery view."

¶ 74 The prosecution then offered into evidence as prosecution Exhibits 11 through 16 a set of individual photos extracted from Plascencia's phone that showed A.R. unconscious and unclothed while lying on a bed. Defense counsel did not object to the admission of these photos, and the court admitted Exhibits 11 through 16.

¶ 75 The next day, the prosecution offered into evidence prosecution Exhibit 45, which consisted of eleven small individual photos extracted from Plascencia's phone that depicted A.R. unconscious and unclothed, many of which were already in

evidence. The prosecutor explained that he was seeking to introduce Exhibit 45 to inform the jury that the photos of A.R. previously admitted into evidence were not the only photos of her found on Plascencia's phone. Defense counsel did not object to the admission of the exhibit, which the court admitted into evidence.

### 2. Preservation and Standard of Review

¶ 76 Plascencia contends that the photos of A.R. extracted from Plascencia's phone were inadmissible under CRE 403 because their admission unfairly prejudiced him. He also argues that the photos were inadmissible hearsay; they were inadmissible because, during closing argument, the prosecutor described them in graphic terms to appeal to the jury's emotions; and the prosecutor did not properly authenticate them.

¶ 77 "Trial courts have broad discretion in determining the admissibility of evidence based on its relevance, its probative value, and its prejudicial impact." *People v. Elmarr*, 2015 CO 53, ¶ 20, 351 P.3d 431, 437. In any event, Plascencia's arguments regarding the photos are unpreserved because defense counsel did not object when the prosecutor moved for the admission of the photos into evidence.

### 3. The Photos Were Admissible Under CRE 403

¶ 78    "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Colorado, by [the Colorado Rules of Evidence], or by other rules prescribed by the Supreme Court, or by the statutes of the State of Colorado."  CRE 402.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401.

¶ 79    But relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403.  "Because the balance required by CRE 403 favors admission, a reviewing court must afford the evidence the maximum probative value attributable by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected."  *Elmarr*, ¶ 44, 351 P.3d at 442 (quoting *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002)).

¶ 80　　The photos of A.R. were essential to the prosecution's case. To convict Plascencia of sexual assault (victim helpless and has not consented), the prosecution was required to prove beyond a reasonable doubt that Plascencia "knowingly inflict[ed] sexual intrusion or sexual penetration" on A.R., that she was "physically helpless" at the time, and that Plascencia knew at the time that A.R. was "physically helpless and . . . ha[d] not consented." § 18-3-402(1)(h). "'Physically helpless' means unconscious, asleep, or otherwise unable to indicate willingness to act." § 18-3-401(3). In addition, because Plascencia asserted the affirmative defense of consent, the jury had to be satisfied, "beyond a reasonable doubt, that the prosecution . . . proved that [A.R.] did not consent to having sex" with Plascencia. *People v. Everett*, 250 P.3d 649, 655 (Colo. App. 2010).

¶ 81　　The photos of A.R. showed that, when Plascencia had sex with A.R., he knew she was "physically helpless and . . . ha[d] not consented." § 18-3-402(1)(h). Because A.R. testified that she lost consciousness while in the basement bedroom with Plascencia, she was unable to describe for the jury what occurred when he had sex with her.

¶ 82    "[D]irect proof of [a] defendant's state of mind is rarely available and, consequently, resort must necessarily be had to circumstantial evidence on this element." *People v. Taylor*, 655 P.2d 382, 384 (Colo. 1982). The photos provided essential circumstantial evidence of Plascencia's mental state when he engaged in sex with A.R. and established that Plascencia knew at the time that she was "physically helpless" and "ha[d] not consented." § 18-3-402(1)(h).

¶ 83    The danger of unfair prejudice did not substantially outweigh the probative value of the photos. A.R. testified about losing consciousness and waking up to discover that she had been sexually assaulted. The photos supported A.R.'s testimony that she was unconscious, and Plascencia knew that she was unconscious, when he had sex with her. *See People v. Wood*, 743 P.2d 422, 428 (Colo. 1987) (concluding that there was no plain error when the challenged evidence "served merely to corroborate the testimony of the victim"). Accordingly, the photos were not inadmissible under CRE 403. (Plascencia asserts in passing that the text messages were also inadmissible under CRE 403. We do not consider this

38

argument because it is undeveloped.  *See People v. Perez*, 2024 COA 94, ¶ 51, 559 P.3d 652, 661.)

### 4. The Photos Were Not Hearsay

¶ 84    In addition, the photos of A.R. were not hearsay because the photos were not "statement[s]" within CRE 801.  They were not "an oral or written assertion" or "nonverbal conduct of a person" intended "to be communicative."  CRE 801(a); *see also United States v. Taylor*, 688 F. App'x 638, 642 (11th Cir. 2017) (muted video clip is not hearsay); *People v. Smith*, 969 N.W.2d 548, 567 (Mich. Ct. App. 2021) ("[A] photograph of someone is not a 'statement' for hearsay purposes.").  Therefore, the photos were not inadmissible hearsay.

### 5. The Prosecutor's Statements in Closing Argument

¶ 85    Plascencia argues that the prosecutor improperly appealed to the jury's emotions by referring to the photos in graphic terms during his closing argument.  During his closing argument, the prosecutor said that, in the photos, A.R. looked "lifeless" and like "a department store" mannequin, which defense counsel argued improperly appealed to the jury's emotions.  The court sustained

defense counsel's objection. Defense counsel did not ask the court for an additional remedy for this alleged prosecutorial misconduct.

¶ 86 When defense counsel objected to the prosecutor's closing argument a second time for improperly appealing to the jury's emotions, the court reminded the jury "not to be swayed by sympathy or bias in reaching [its] decision."

¶ 87 We note that Plascencia's argument regarding the prosecutor's closing argument does not relate to whether the photos were admissible evidence. Rather, it is a mislabeled prosecutorial misconduct argument. But Plascencia does not argue prosecutorial misconduct on appeal.

¶ 88 In any event, the prosecutor's characterization of the photos during closing argument did not prejudice Plascencia because the court sustained the defense's objections to the prosecutor's language. *See People v. McKnight*, 567 P.2d 811, 814 (Colo. App. 1977); *People v. Hogan*, 114 P.3d 42, 55-56 (Colo. App. 2004) ("The remarks were corrected when the court sustained the objections, admonished the prosecutor, and appropriately instructed the jury. . . . [Therefore], reversal of the convictions is unwarranted on this record."). Accordingly, we reject Plascencia's argument that the

photos were inadmissible because of the manner in which the prosecutor described them during his closing argument.

### 6. Plascencia's Argument that the Photos Were Not Properly Authenticated

¶ 89   Plascencia presents an eleven-word argument that "[t]he content purportedly downloaded from [Plascencia's] phone was not properly authenticated." Because this argument is undeveloped, we decline to address it on the merits. *See Perez*, ¶ 51, 559 P.3d at 661.

### E. The Court Did Not Err by Admitting Evidence of A.R.'s Miscarriage and Subsequent D&C

#### 1. Additional Facts

¶ 90   A.R. was the prosecution's first witness at trial. At the outset of A.R.'s testimony, the prosecutor asked about her relationship with Couch at the time of the sexual assault. A.R. said that she and Couch "had just gone through something pretty strong for a couple who hadn't been together for very long." The prosecutor asked, "You said you had just [gone] through something pretty strong . . . . [C]an you tell us about that?" Defense counsel objected, and the court conducted a sidebar conference.

¶ 91    During the sidebar, defense counsel objected to A.R.'s anticipated testimony regarding her miscarriage, the D&C, and the pain and bleeding she experienced after the D&C (collectively, the medical testimony): "I think this is nothing more than an attempt to appeal to the emotions of the jury and details of that particular situation are completely irrelevant to this case. They have nothing to do with whether or not she was assaulted . . . ." The prosecutor responded, "It's completely relevant because following her medical procedure that resulted from that miscarriage, she was instructed not to have sex as a result of the procedure for a period of time and that anything of a sexual nature would have been painful to her."

¶ 92    At no time during the trial did defense counsel mention the rape shield statute, section 18-3-407, C.R.S. 2024, much less object to the admission of the medical testimony on the grounds it was inadmissible under the rape shield statute.

¶ 93    Following further argument, the court overruled the defense's objection, although it limited the medical testimony to "the timing of what happened, instructions that [A.R.] received," and any "physical impact" that affected her ability "to have sex during this time

42

period." The court was firm that it would not permit A.R. to describe the "emotional impact" of the miscarriage and the D&C.

¶ 94 A.R. then testified about her miscarriage the month before the sexual assault and the D&C necessitated by the miscarriage. She explained that, after the D&C, she had some cramping and "bleeding that went on for a little while." A.R. testified that she and Couch "had one attempt" at sex "at some point but [she] was still in pain so [they] did not have any activity for several weeks." She also said that she was wearing a pad on the night of the sexual assault because she "still had bleeding" and was "even then . . . wearing a pad every day."

### 2.	Preservation and Standard of Review

¶ 95 Defense counsel preserved Plascencia's argument that the medical testimony was inadmissible under CRE 401, 402, and 403. But Plascencia did not preserve his argument that the medical testimony was inadmissible under the rape shield statute. "If an objection or request was made in the trial court on grounds different from those raised on appeal, the issue is unpreserved." *People v. Gee*, 2015 COA 151, ¶ 45, 371 P.3d 714, 722. We consider whether the court erred by not excluding the medical

43

testimony under the rape shield statute because a court does not plainly err if it did not err. *See People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000).

### 3. The Court Did Not Err by Not Excluding the Medical Testimony Under the Rape Shield Statute

¶ 96 Plascencia first contends that the medical testimony was inadmissible because "evidence regarding [A.R.'s] prior miscarriage and corresponding lack of recent prior sexual activity" was inadmissible under the rape shield statute. We disagree that the medical testimony fell within the scope of the rape shield statute.

### a. Controlling Law

¶ 97 "The basic purpose of the [rape shield] statute's public policy is to protect sexual assault victims from 'humiliating and embarrassing public fishing expeditions into their past sexual conduct.'" *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006) (quoting *People v. McKenna*, 585 P.2d 275, 277-78 (Colo. 1978)).

¶ 98 Subsection (1) of the rape shield statute says, in relevant part,

> Subject to constitutional limitations, evidence of specific instances of the victim's . . . prior . . . sexual conduct . . . may be admissible only at trial and shall not be admitted in any other proceeding except at a

> proceeding pursuant to subsection (2)(c) of this
> section. At trial, such evidence is presumed to
> be irrelevant . . . .

§ 18-3-407(1). Subsection (2) sets forth the procedure a party must follow in criminal prosecutions for specified offenses — including the sexual assault offenses with which Plascencia was charged — to introduce evidence of the victim's "prior . . . sexual conduct." § 18-3-407(2).

¶ 99    The proponent of the evidence must make a written motion "at least thirty-five days prior to trial, unless later for good cause shown, to the court and to the opposing parties stating that the moving party has an offer of proof articulating facts that would support a judicial finding that the evidence overcomes the presumption of irrelevance." § 18-3-407(2)(a)(I). The statute then sets forth the additional procedural steps required before the subject evidence can be admitted at trial. *See* 18-3-407(2)(a)-(e).

¶ 100    We review for plain error whether the court erred by not excluding the medical testimony under the rape shield statute on its own initiative. *See Hagos*, ¶ 14, 288 P.3d at 120.

### b. The Medical Testimony Was Not Inadmissible Under the Rape Shield Statute

¶ 101    Plascencia does not cite, and we are unaware of, any legal authority holding that the rape shield statute bars a victim from disclosing that, at the time she was sexually assaulted, she was refraining from sex due to a physical condition that made sex painful for her. *See People v. Hood*, 2024 COA 27, ¶ 12, 550 P.3d 723, 727 (noting that evidence does not become inadmissible solely because it indirectly involves a victim's prior sexual conduct).

¶ 102    Plascencia cites *Fletcher v. People*, 179 P.3d 969, 972 (Colo. 2007), in which the supreme court held that a "victim's testimony that she had never had sex before [a sexual] assault [is] inadmissible," to support his argument that the prosecution was "prohibited from introducing evidence of" A.R.'s medical history and her "corresponding *lack* of prior sexual activity." But the prosecution in *Fletcher* sought to introduce the evidence of the victim's virginity to attempt to prove that the defendant "was the source of the victim's vaginal tear." *Id.* at 974. The supreme court held that such evidence was "too remote in time" to establish that the defendant caused the victim's injury. *Id.* at 975. Moreover, the

*Fletcher* court expressly declined to "determine whether the rape shield statute bar[red] the admission of the evidence in th[at] case." *Id.* at 971.

¶ 103   Unlike the prosecution in *Fletcher*, the prosecution in this case did not seek the admission of the medical testimony to prove that Plascencia caused any physical injuries to A.R. Rather, the prosecution sought to offer the medical testimony into evidence to establish that A.R.'s physical condition made it unlikely that she consented to have sex with Plascencia. Further, A.R.'s testimony that she did not engage in sexual activity with Couch in the weeks leading up to the sexual assault because sex was too painful for her was not too remote in time to the sexual assault. The physical condition that led A.R. to refrain from sex with Couch had not materially changed by the time of the sexual assault.

¶ 104   Plascencia also relies on *People v. Harris*, 43 P.3d 221, 223, 224-26 (Colo. 2002), in which the defendant sought to introduce evidence that the victim had engaged in consensual sex with her "serious boyfriend" four days before the assault to "explain that [a] vaginal abrasion may have been caused by [the victim]'s prior consensual intercourse and not by [the defendant]." The supreme

court affirmed the exclusion of evidence of the victim's earlier sexual encounter. *Id.* at 231. *Harris* does not help Plascencia because, as noted above, the prosecution did not attempt to prove that he physically injured A.R.

¶ 105 The rape shield statute did not apply to the medical testimony because it was not evidence of A.R.'s "prior . . . sexual conduct." § 18-3-407(1). To the contrary, it informed the jury about A.R.'s *physical condition* that made sex painful for her, which made it more probable than not that she did not consent to have sex with Plascencia. Because A.R.'s testimony was evidence of a physical condition, it is not the type of sexual conduct evidence that the rape shield statute was intended to preclude.

¶ 106 In sum, the prosecution called A.R. to testify about her vaginal pain and bleeding not to subject her to a "humiliating and embarrassing public 'fishing expedition[],'" *McKenna*, 585 P.2d at 278, but to directly attack Plascencia's argument that A.R. agreed to have sex with him. We therefore hold that the rape shield statute did not bar the admission of the medical testimony.

## 4. The Medical Testimony Was Admissible Under CRE 401, 402, and 403

¶ 107    Plascencia preserved his second argument that the medical testimony was inadmissible — that it was irrelevant and an improper "attempt to appeal to the emotions of the jury."

¶ 108    Turning first to the relevance rules — CRE 401 and 402 — the medical testimony was relevant to Plascencia's affirmative defense of consent; the medical testimony made it more likely that A.R. did not consent to sex with Plascencia because she was experiencing bleeding and pain from the D&C at the time of the sexual assault.

¶ 109    Plascencia challenges the link between his consent theory of defense and the medical testimony. He takes issue with the prosecution's argument at trial that "by asserting the defense of consent, [Plascencia] somehow opened the door to the admission" of the medical testimony. "The concept of 'opening the door' represents an effort by courts to prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression." *People v. Murphy*, 919 P.2d 191, 195 (Colo. 1996).

¶ 110    The record shows that the defense opened the door to admission of the medical testimony by arguing that A.R. willingly engaged in sex with Plascencia.  The medical evidence persuasively demonstrated that, at the time of the sexual assault, A.R. was in too much pain and bleeding too heavily to agree to have sex with anyone.

¶ 111    Plascencia's CRE 403 argument fares no better than his relevance argument.  "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under [CRE] 403." *Masters v. People*, 58 P.3d 979, 1001 (Colo. 2002) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)).  (We interpret defense counsel's argument that the medical testimony was an improper "attempt to appeal to the emotions of the jury" as a CRE 403 argument, although we note that defense counsel did not cite CRE 403 at the time.)

¶ 112    The probative value of the medical testimony substantially outweighed any unfair prejudice.  Contrary to Plascencia's contention, the prosecution did not introduce the medical testimony to portray A.R. as "innocent" or "vulnerable"; as noted, the court

prohibited A.R. from testifying on the "emotional impact" of the miscarriage and D&C. Moreover, during jury instructions, the court reminded the jury "not [to] be influenced by sympathy, bias or prejudice" in reaching its decision.

¶ 113 We reiterate that the prosecution introduced the medical testimony to rebut Plascencia's theory of consent. It may have been the strongest evidence establishing why it was so unlikely that A.R. would have consented to engage in sex with Plascencia. Given the importance of the medical testimony to the prosecution's rebuttal to Plascencia's consent defense, its probative value outweighed any prejudice to Plascencia.

¶ 114 Accordingly, the medical testimony was admissible under CRE 401, 402, and 403.

### F. There Was No Cumulative Error Because the Court Did Not Err

¶ 115 "A cumulative error analysis aggregates all trial errors that individually have been found harmless, and therefore not reversible, and analyzes whether their cumulative effect is such that they can no longer be deemed harmless." *People v. Clark*, 214 P.3d 531, 543 (Colo. App. 2009), *aff'd on other grounds*, 232 P.3d 1287 (Colo.

2010). "[R]eversal is warranted when numerous errors in the aggregate show the absence of a fair trial, even if individually the errors were harmless or did not affect the defendant's substantial rights." *Howard-Walker v. People*, 2019 CO 69, ¶ 26, 443 P.3d 1007, 1012. We review cumulative error claims de novo. *Id.* at ¶ 22, 443 P.3d at 1011.

¶ 116 Plascencia asserts that the cumulative effect of the court's errors violated his "due process right to a fair trial," including "the right to a fair and impartial jury." Because we reject Plascencia's contentions of error, we necessarily reject his cumulative error argument. *See People v. Rios*, 2020 COA 2, ¶ 39, 463 P.3d 322, 330.

### III. Disposition

¶ 117 The judgment of conviction is affirmed.

JUDGE JOHNSON and JUDGE MOULTRIE concur.